UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTONIA PHILLIPS by her parents and
natural guardians GERTRAL GREEN and
ANTONIO PHILLIPS, and GERTRAL GREEN
and ANTONIO PHILLIPS, individually,

                              Plaintiffs,

            —— against ——

THE CITY OF NEW YORK, KAKILIA KINSEY,
JESUS RIVERA, "JOHN" NEWMARK, first
name being fictitious and unknown,
SHEMAIN WEBB, "JOHN DOES" and "JANE
DOES," said names being fictitious
and unknown, CATHOLIC HOME BUREAU,
MARINA SEDA, "JOHN ROES" and "JANE
ROES," said names being fictitious
and unknown, CIELO CARTAGENA, JESUS
GONZALEZ and KIM VORHEES,

                              Defendants.

03 Civ. 4887 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION...........................................1

II. FACTS...................................................2

A.  REMOVAL OF ANTONIA AND HER SIBLINGS....................2

B.  FAMILY COURT PROCEEDINGS AFTER THE REMOVAL............5

C.  ANTONIA'S STAY AT THE CHILDREN'S CENTER...............8

    1.  Conditions of the Children's Center...............8

    2.  Antonia's Stay at the Children's Center
        from January 22-23, 2003.........................12

D.  ANTONIA'S TRANSPORTATION TO THE FOSTER HOME..........24

-i-

E.   TIMING OF THE INJURY.................................27

F.   ANTONIA'S STAY AT THE FOSTER HOME....................28

     1.   Phone Conversation Between Seda and Cartagena...29

     2.   Events on January 25, 2003......................33

**III. CLAIMS.............................................35**

**IV.  LEGAL STANDARD.....................................36**

**V.   DISCUSSION OF CLAIMS ASSERTED AGAINST CITY
       DEFENDANTS .........................................37**

     A.   CLAIMS ARISING FROM ANTONIA'S REMOVAL FROM
          HER PARENTS' CUSTODY............................37

          1.   Rooker-Feldman's Procedural Requirements
               Are Met....................................39

          2.   Rooker-Feldman's Substantive Requirements
               Are Met....................................44

     B.   QUALIFIED IMMUNITY AND CLAIMS AGAINST KINSEY,
          RIVERA, AND VORHEES.............................53

     C.   LIABILITY FOR INJURY TO ANTONIA AT ACS
          FACILITY UNDER COUNT TWO .......................54

               1.   Kinsey, Rivera, and Vorhees..........61

               2.   Webb-Alexander.......................61

               3.   Unnamed Defendants...................66

     D.   LIABILITY FOR INJURY TO ANTONIA AT ACS FACILITY
          UNDER COUNT FOUR................................68

          1.   Whether the City Can Be Liable Absent a
               Constitutional Violation by a
               Named Defendant............................69

          2.   Whether the Constitutional Violations
               Were a Result of an Official Policy
               or Custom .................................71

              a.    Inadequate Training...................73

              b.    Inadequate Supervision...............79

              c.    Inadequate Hiring....................83

        3.    State Law Claims..........................84

    E.   CITY LIABILITY FOR FOSTER AGENCY DEFENDANTS'
       ACTIONS ........................................89

**VI.  DISCUSSION OF CLAIMS ASSERTED AGAINST FOSTER
AGENCY DEFENDANTS.................................90**

    A.   WHETHER PHILLIPS AND GREEN HAVE STANDING TO
       BRING INDIVIDUAL CLAIMS UNDER § 1983...........91

    B.   SECTION 1983 CLAIMS............................95

        1.    Whether CHB and Seda Were Acting under
            Color of State Law........................96

        2.    Whether CHB and Seda Had the Requisite
            Deliberate Indifference..................101

    C.   STATE LAW CLAIMS..............................107

        1.    Whether CHB and Seda Acted Negligently....108

        2.    Proximate Cause...........................110

        3.    Qualified Immunity under Social Services
            Law § 419.................................114

**VII. ORDER...........................................116**

# I.  INTRODUCTION

Plaintiff Antonia Phillips ("Antonia") by her parents, Gertral Green ("Green") and Antonio Phillips ("Phillips"), as well as Green and Phillips individually (collectively, "Plaintiffs"), brought this action asserting federal constitutional and state law violations.  The case arose out of the removal of Antonia from Green's and Phillips's custody by New York City employees and the severe injuries Antonia sustained allegedly after her removal, either during her stay at a New York City facility for children awaiting placement in a foster home, or during her subsequent placement in a foster home.  Plaintiffs have sued (1) the City of New York (the "City") and several of its employees (collectively, the "City Defendants") who were involved in the decision to remove Antonia from her parents' custody and who cared for her prior to foster care placement; (2) Catholic Home Bureau ("CHB"), a private, not-for-profit foster care agency that contracts with the City to provide foster care placement services, and its employee Maria Seda ("Seda") (collectively, the "Foster Agency Defendants"); and (3) Cielo Cartagena ("Cartagena"), the foster mother with whom Antonia was placed in foster care.[1]

The City Defendants and the Foster Agency Defendants

---

[1] Plaintiffs also had sued Jesus Gonzalez ("Gonzalez"), the foster care father, but voluntarily dismissed him from the action by notice dated July 6, 2005. (See Docket No. 67.)

have each moved for summary judgment.  For the reasons set forth below, the motions are granted in part and denied in part.[2]

## II.  FACTS[3]

A.  <u>REMOVAL OF ANTONIA AND HER SIBLINGS</u>

Antonia was born on May 17, 2002 to Green and Phillips. On September 9, 2002, Green informed the staff at the Baruch Houses, where she then resided with Phillips, Antonia, and her two other children, Alicia (born June 30, 1998) and Mykle (born July 17, 1997), that Phillips had hit Mykle with a belt,

---

[2] In support of their reply brief, the City Defendants provided additional exhibits not part of the set of exhibits supporting their initial motion for summary judgment.  By letter dated February 21, 2006, Plaintiffs objected to this submission as "inappropriate" and requested that such exhibits not be considered by the Court.  However, by response letter dated February 22, 2006, the City Defendants represented that these exhibits are documents that are all in Plaintiffs' possession, and, more importantly, that the exhibits address arguments made by Plaintiffs not contained in Plaintiffs' answers to contention interrogatories -- such as the argument that the City had a policy and practice of understaffing the ACS Children's Center.  The Court further notes that many of the exhibits to which Plaintiffs object are contained in Plaintiffs' own submissions in opposition to the City Defendants' motion - such as the deposition testimony of Gertha Charles and Esther Boone.  Accordingly, the Court will consider these exhibits where appropriate.

[3] The following factual recitation is taken from the City Defendants' Corrected Rule 56.1 Statement, dated Dec. 9, 2005 ("City Def. Rule 56.1 Statement"); Plaintiffs' Response to Municipal Defendants Corrected Rule 56.1 Statement, dated Jan. 17, 2006 ("Pl. Rule 56.1 Response (City)"); the City Defendants' "Response" to Plaintiffs' Rule 56.1 Statement, dated Feb. 15, 2006 ("City Def. Rule 56.1 Response"); Catholic Home Bureau and Marina Seda's Statement Pursuant to Rule 56.1, dated Dec. 2, 2005 ("Foster Agency Def. Rule 56.1 Statement"); Plaintiffs' Response to Defendant Catholic Home Bureau and Marina Seda's Rule 56.1 Statement, dated Jan. 17, 2006 ("Pl. Rule 56.1 Response (Foster Agency)"); and the Municipal Defendants' Response to the Rule 56.1 Statement Submitted by Catholic Home Bureau and Marina Seda, dated Jan. 18, 2006 ("City Def. Response to Foster Agency Rule 56.1 Statement").  No further reference will be made to these documents except as specifically quoted.  Facts are undisputed unless otherwise noted.

causing marks.   Staff at the Baruch Houses contacted the City's Administration for Children's Services ("ACS"), and on September 11, 2002, an ACS caseworker filed a petition for neglect against both Green and Phillips in Manhattan Family Court.   On November 18, 2002, Family Court Judge Sara P. Schechter ("Judge Schechter") issued an order (the "November 18, 2002 Order") determining that Phillips had used excessive corporal punishment and provided inadequate guardianship. Judge Schechter also issued an Order of Protection directing Phillips to stay out of the home and away from the children. The November 18, 2002 Order granted an "adjournment in contemplation of dismissal," paroling the children to Green under ACS supervision on the condition that she comply with all court directives, including enforcing the Order of Protection and attending counseling and parenting classes.[4] Shortly thereafter, the case was assigned to an ACS court-ordered supervision unit and defendant Kakilia Kinsey ("Kinsey") was assigned as ACS caseworker.

In December 2002 and January 2003, Kinsey documented growing concerns about Green's care of the children,

_____

[4] Plaintiffs dispute the requirements of the November 18, 2002 Order, noting that it required Green to cooperate with the Lower Eastside Family Union which was to provide parenting classes and individual counseling to her, and to attend classes that as of the date of the Order had not been provided to her.  The Court finds this dispute immaterial, as by either party's account  the November 18, 2002 Order required Green to attend parenting classes and receive some form of counseling.

specifically:  that she had given Antonia away to another
person; that she claimed to be employed at a Payless Shoe
store but that the manager had never heard of her and there
was no record of Green in the company's computer; that
Phillips had visited with the children despite the Order of
Protection; that Green was smoking marijuana in the apartment;
that Antonia was allegedly staying for a few days with
godparents, who denied caring for her; and that Green did not
produce Antonia at ACS's request.  Although Plaintiffs do not
dispute that Kinsey documented these concerns, they dispute
the "validity" of her concerns.  However, Plaintiffs do not
cite to any evidence to support their version of this dispute
in accordance with Federal Rule of Civil Procedure  Rule 56(e)
and Local Rule 56.1(d).

On the afternoon of January 22, 2003, ACS convened a
meeting after learning that Green had given Antonia away to
another person, Raquel Simmons ("Simmons"), and that Green had
called the police to accuse Simmons of kidnapping.  The
meeting was attended by Green, Antonia, Simmons, Kinsey,
defendant ACS Supervisor II Jesus Rivera ("Rivera"), defendant
ACS Child Protective Manager Kim Vorhees ("Vorhees"), and
others.  At the meeting, Green and Simmons exchanged verbal
insults, and the two women gave differing accounts of how long
Simmons had been caring for Antonia:  Green said a short time,

while Simmons said since October 2002.  That meeting caused
Vorhees to become concerned about violations of the November
18, 2002 Order, the whereabouts of Antonia, and the ability of
ACS to comply with the November 18, 2002 Order and supervise
the Green home when the children were not there.  After
consultation with an ACS deputy director, Vorhees made the
decision to remove all three children from Green's care.  This
decision was made on that day, sometime between 5:00 p.m. and
6:30 p.m.

B.   <u>FAMILY COURT PROCEEDINGS AFTER THE REMOVAL</u>

On January 24, 2003, a preliminary hearing occurred in
Family Court, after which Judge Schechter signed an order (the
"January 24, 2003 Order") directing temporary removal of the
children based on Green's failure "substantially to observe
the terms of [the November 18, 2002] order."  (Order dated
Jan. 24, 2003, attached as Ex. D to Affidavit of Suzanne M.
Halbardier, dated Dec. 2, 2005 ("Halbardier Aff."), at
FC0131;[5] <u>see</u> <u>also</u> Def. Rule 56.1 Statement ¶ 12.)

Plaintiffs dispute that Green was given notice of the
January 24, 2003 proceedings.  Although the transcript of the
hearing indicates that Green's counsel was present, Green

_____

[5] This order is captioned with the name of Antonia's sister, Alicia Green,
but not Antonia herself.  Both parties have treated this exhibit as if it
is the order pertaining to Antonia; the Court assumes either that this
order encompasses the proceedings for all three children, or that an
identical order was issued for Antonia but that the City Defendants
included the wrong order in their exhibits.

herself was not, and Green's counsel stated during the hearing
that her client did not know she was supposed to be in court
that day.  Neither party has offered any explanation as to how
Green's counsel, but not Green herself, received notice of the
hearing, or as to why Green's counsel did not inform her of
the proceeding if she was aware that Green did not know about
it.  The City Defendants agree that Green should have received
notice, but contend that this requirement was satisfied
because Rivera gave her oral notice at the time of Antonia's
removal that they were going to court the next day and that
she had to "show up" "in order to have any chance upon (sic)
getting her child back."  (City Def. Rule 56.1 Response ¶ 6;
Deposition of Jesus Manuel Rivera, dated Feb. 7, 2005 ("Rivera
Dep."), attached as Ex. F to Halbardier Aff., at 178.)
According to Plaintiffs, ACS policies require, upon removal of
a child from custody, immediate written notice in the form of
a "701B notice," which gives the parent or custodian the right
to a hearing by the next court business day following
removal.[6]

Plaintiffs also contend that the hearing should have been
conducted on January 23, 2003, not January 24, 2003.
Plaintiffs contend that ACS had a policy, mandate, guideline,

---

[6] Rivera testified that under ACS policy, a "701B notice" should be given
to the parent "right away" upon emergency removal if the parent is
available, and that since Green was not given such notice, that was
"technically" a violation of ACS policies.  (Rivera Dep. at 161-62).

or regulation that a petition was to be filed within 24 hours after an emergency removal without a court order.  Thus, since the removal was carried out on Wednesday January 22, 2003, the petition should have been filed no later than Thursday, January 23, 2003.  Rivera testified that such a petition should be filed within 24 hours or the next business day.  The City Defendants agree that ACS workers were directed to go to court within 24 hours but dispute that this was a "regulation" or "mandate," pointing out that the relevant statute in 2003 required a hearing within three days.  The City Defendants also point out that Kinsey <u>did</u> go to court on Thursday, January 23, 2003, but that a delay ensued, allegedly on account of confusion as to which type of petition needed to be filed, thus causing the hearing to occur on Friday, January 24, 2003 instead.  The City Defendants also dispute that Judge Schechter would have made any different determination on Thursday than she would have on Friday.

After further hearings and fact finding, Judge Schechter signed an order on March 28, 2003, finding that Green had indeed violated the terms of the November 18, 2002 Order by giving Alicia and Antonia to caretakers without informing ACS, actively misrepresenting the children's whereabouts to ACS, and smoking marijuana in the children's presence.  On April 8, 2003, the Family Court signed an Order of Neglect against

Green.  The children remain in foster care.

C.  ANTONIA'S STAY AT THE CHILDREN'S CENTER

At 8:40 p.m. on the evening of January 22, 2003, Rivera and Kinsey brought Antonia and her siblings to ACS's Pre-Placement Services (the "Children's Center"), where children who have been removed from a parent or guardian are brought and medically cleared for placement.

1.  Conditions of the Children's Center

The City Defendants describe the Children's Center as having various forms of security, including a metal detector at the main entrance through which children enter, the requirement that all persons entering the building must display an ACS identification badge or sign in at the security desk, and another entrance monitored by a security guard. Also according to the City Defendants, children are present only on the second and third floors, except for when they enter and leave on the first floor; at least one security guard is posted at all times on the second and third floors; nurses' units are on the second and third floors; children and teenagers are always accompanied by a staff member; and if any unaccompanied children or strangers are ever present on the second or third floor, ACS employees and security guards are trained to intervene and contact a supervisor.

Plaintiffs dispute these facts by challenging the

-8-

sufficiency of the affidavit upon which they rest.
Specifically, the City submitted an affidavit of Willie Maye
("Maye"), the Director of Pre-Placement Services at ACS.
According to Plaintiffs, Maye's affidavit does not indicate
that he had personal knowledge of the ACS facility's
conditions as they existed when Antonia was there on January
22-23, 2003, and that the description he provided matches the
conditions as they existed on those days.  It is true that
Maye's affidavit does not expressly state that it is made "on
the basis of personal knowledge."  However, Maye had been the
Director of Pre-Placement Services at ACS since May 22, 2001
and prior to that time and since March 21, 1999 had been
Deputy Director.  (See Affidavit of Willie Maye, Jr., dated
Dec. 1, 2005, ¶ 1, attached as Ex. L to Halbardier Aff.)  Maye
further indicated that from his position as Director, he was
familiar with the management, security, and oversight of
children in the facility's care.  (Id. ¶ 1.)  The Court finds
no adequate basis upon which a rational factfinder could
reasonably infer that Maye's position – which he held during
the relevant time frame - and his sworn statement that he was
familiar with the management and security of the Children's
Center would not give him sufficient personal knowledge of the
facility.  Accordingly, the Court has considered Maye's
affidavit.

The ACS employees who directly care for the children at the Children's Center are called childcare workers or "Children's Counselors."  According to Maye, prior to working at the Children's Center, these employees prepare an employment application and submit to a criminal background check.  Maye also stated that the Children's Counselors are required to undergo training during their employment, including training on signs of child abuse and shaken baby syndrome.  They are also cleared through the State Central Register, as are all ACS employees.  Although Plaintiffs dispute that the Children's Counselors assigned to Antonia on January 22-23, 2003 had any such training or background checks, other than these conclusory statements, Plaintiffs do not offer any material evidence suggesting otherwise.  Plaintiffs also point out that the childcare workers do not receive training prior to employment by ACS, and that the in-house training is "sporadic," consisting of only four sessions in one year that each lasted one and one-half to two hours.

According to the City Defendants, a supervisor is on duty for each shift at the Children's Center; the shifts are 8:00 a.m. to 4:00 p.m., 4:00 p.m. to midnight, and midnight to 8:00 a.m.  The supervisor's office is on the third floor.  The nursery (for infants) is on the second floor, and children between six to twelve years of age also stay on the second

-10-

floor, but in a different area.  According to the City
Defendants, teenagers stay on the third floor.  Plaintiffs
dispute that teenagers stay only on the third floor and
contend that a sixteen-year-old was on the second floor at
some point during Antonia's stay.  Specifically, an ACS nurse,
Carmen Nieves ("Nieves"), who worked at ACS on January 23,
2003, testified that the third floor remains closed until 5:00
p.m., that teenagers are placed on the third floor only if
there are "enough teenagers," and that ACS records indicate
that on January 23, 2003, a sixteen-year-old was on the second
floor at some point to be seen by the nurses, and she did not
know what the teenager did after being medically cleared.  The
deposition testimony on this point is somewhat ambiguous;
however, it is clear that at some point on January 23, 2003,
the nurses at the Children's Center took vital signs for a
sixteen-year-old on the second floor.

    According to the City Defendants, a supervisor is present
during each shift to address any problems such as sick
children or staffing issues; a security guard is stationed
between the nursery and the nurse's station; the childcare
workers and their supervisors are trained to notify the nurse
on duty of any illnesses or problems with a child, are trained
to prepare an accident report if any child is injured during
a shift, and are trained to report any unusual incidents to

-11-

their supervisor.  Plaintiffs dispute these facts, again on the ground that there is no indication that the affiant, Maye, had personal knowledge of the conditions as they existed on January 22-23, 2003.  Plaintiffs also contend that Maye did not indicate that accident reports are required if a child is injured, or that childcare workers actually report any unusual incidents to their supervisors as a matter of custom.

The City Defendants assert that there has never been a report of a "shaken baby" or a serious injury to a child at the Children's Center.  Maye, who, as indicated, has been the ACS Pre-Placement Services Director since May 22, 2001, and prior to that time Deputy Director from March 21, 1999, attested that he was not aware of any non-accidental or serious injury at the facility during his tenure.  Plaintiffs again claim that there is no evidence that such reports are required.

## 2. Antonia's Stay at the Children's Center from January 22-23, 2003

Antonia, Alicia, and Mykle arrived at the Children's Center at 8:40 p.m. on January 22, 2003.  Rivera and Kinsey stayed with them in the waiting area while paperwork was completed.  At about 9:00 p.m., Antonia was brought to the nurse's station on the second floor and examined by Pola Albano ("Albano"), a Certified Pediatric Nurse Practitioner employed at the Children's Center since 1999.  The examination

-12-

ended at about 10:00 p.m.  Albano found that Antonia had a
fever of 100.2 degrees, which was measured with a rectal
thermometer, and a mild upper respiratory infection.  She
observed no bruises or discoloration on Antonia.  Antonia was
happy, active and alert, not in distress, sat without support,
and was not vomiting or having diarrhea.  Albano medically
cleared Antonia for placement in a foster home.

Antonia was transferred to the nursery and was logged in
at approximately 10:28 p.m.  ACS Children's Counselor Stacie
Dalrymple ("Dalrymple"), who has worked at the Children's
Center for over seven years and whose duties included ensuring
the children's safety, as well as bathing, clothing, and
feeding them, was on duty in the nursery during the 4:00 p.m.
to midnight shift on January 22, 2003.  Dalrymple wrote in the
Children's Center nursery log book that, according to the
nurse, Antonia had a fever and needed a lot of fluids, and
that she drank Prosobee.  Dalrymple recalled that Albano had
instructed her to give Antonia "lots" of fluids but not
formula.  Although Plaintiffs dispute that Dalrymple received
training for her job duties, the deposition testimony to which
they point actually indicates that Dalrymple received
training.[7]

_____

[7] Specifically, the following line of questioning ensued:

    Q:   What are your duties?
    A:   Ensure the child's safety.  Bathe them.  Cloth [sic] them.

Two childcare workers, Milana Maksumov ("Maksumov") and Gertha Charles ("Charles"), who have worked at ACS for four and six years, respectively, were on duty during the midnight to 8:00 a.m. shift on January 23, 2003 and received information about the children in their care from the previous shift workers.  They were trained to bring a child experiencing any complications, vomiting, or other suspicious behaviors to the nurse.[8]  At the end of the shift, Charles's practice was to talk to incoming workers and update them on the children.

According to the City Defendants, during the midnight to 8:00 a.m. shift on January 23, 2003, Antonia slept through the night and was resting comfortably, and the staff observed no cuts or bruises on her.  Plaintiffs dispute these facts,

---

```
            Feed them.  Make sure they do certain duties that we have.
    Q:      Did you have any training for this position, --
    A:      Yes.
    Q:      - before you came aboard on Administration for Children's
            Services?
    A:      Yes.
    Ms. Halbardier:  Objection to form, "came aboard," but you can
            answer.
    A:      Yes.
    Q:      What training did you have?
    A:      We had training from the Children's Village.
    Q:      Is that where you were employed before Administration for
            Children's Services?
    A:      No, they just come in and train us.
    Q:      So you had, basically, on-the-job training?
    A:      Yes.
```

(Deposition of Stacie Dalrymple, dated June 8, 2005, attached as Ex. O to Halbardier Aff., at 5-6.)

[8] Plaintiffs do not dispute this allegation, but point out that the City Defendants cite only to Maksumov's deposition, not to Charles's deposition.

-14-

asserting that the City Defendants' allegations are based on "unsworn" hearsay "from a non-party with no personal knowledge." (Pl. Rule 56.1 Response (City) ¶ 27.) The document upon which the City Defendants rely is part of a portion of the file maintained by ACS's Office of Confidential Investigations; it is dated January 29, 2003, and consists of a paragraph summarizing the facts just indicated, with the name "Jillian O'Brian" typed underneath, and below that, in handwriting, the words "Staff at Children's Center." Plaintiffs, relying on Charles's own deposition, point out that at the beginning of this shift, Antonia was asleep in a crib, but as of the end of the shift she had been taken from her crib and placed in a stroller. Although Charles does not recall whether Antonia woke from her sleep or was crying during the night shift, according to Charles, crying is at least one reason childcare workers would move a child from a crib to a stroller during the night.

Plaintiffs contend that the Children's Center was understaffed. According to Plaintiffs, there should have been three staff members that night instead of two, the Center was significantly understaffed, Charles's supervisors were aware of this, and it was a condition that existed most of the time. First, Charles indicated that it was a busy night for the two childcare workers because there were nine children at the

Children's Center that night, with two childcare workers.  A child got sick during the night and had to go to the hospital, and Charles mistakenly wrote down that the child who got sick was Antonia.  Charles indicated that this type of mistake "could have been, yeah" the kind that she would make because she was so busy.  (Deposition of Gertha Charles, dated June 7, 2005 ("Charles Dep."), attached as Ex. A to Second Vanderpuye Aff.,[9] at 47-50.)  In addition,  Charles testified to the following:

> Q:   ... [B]ased upon the log, could you tell me how many children were present?
>
> A:   Right now, let's see, ... [counting]... 9.
>
> Q:   Nine children?
>
> A:   Yes.
>
> Q:   And how many staff member were assigned?
>
> A:   We only had two.  That's what I'm going to answer, two.
>
> Q:   Did you request additional staff that night?
>
> A:   If I requested?
>
> Q:   Yes.
>
> A:   I don't have to request them.  My supervisor will know, you know, if we are understaffed.  If we are

---

[9] Plaintiffs have submitted two affidavits by Ms. Vanderpuye, both dated January 9, 2006, with different exhibits attached.  One contains Exhibits "A" through "J", and the other contains Exhibits "A" through "Q" – with the result that different exhibits have been given the same label.  For purposes of clear citation to the record, the Court will refer to the affidavit containing Exhibits "A" through "J" as "First Vanderpuye Aff.", and the affidavit containing Exhibits "A" through "Q" as "Second Vanderpuye Aff."

under, it's mostly two.  We can't help it.

Q:    Okay.  So if you're understaffed, they only assign
      two?

A:    Yes, they understaffed, but usually we have – we
      have the babies, we have the toddlers and we also
      have the little ones.  Mostly there is two staff
      there.  Sometimes we pull them.  If I want to take
      a baby to the nurse or take the baby to change
      diapers, you know, we will ask one of them to help
      the other.

(Charles Dep. at 9-10.)  In addition, Plaintiffs contend,

based on Dalrymple's testimony, that in general there should

have been a ratio of one staff member to three children at the

Children's Center, and thus if there were nine children, there

should have been three staff members.  The City Defendants

point out that Dalrymple described only the 4:00 p.m. to

midnight shift this way.  In addition, some evidence suggests

that several children left during the night, leaving four or

five children for most of the shift.  (See Log, Jan. 22, 2003,

12:00 AM - 8:00, attached to Ex. K to Halbardier Aff. at NYC

2940.)

     Childcare worker Esther Boone ("Boone") worked the next

shift (8:00 a.m. to 4:00 p.m.) on January 23, 2003. In a

deposition, Boone testified that she has worked at ACS for

three years and has received training in connection with her

work at the Children's Center.  Her duties include monitoring

each child to make sure that the children do not hurt

themselves, and to read to and interact with them.  If a child

-17-

is vomiting, has diarrhea, or is sick in some other manner, the Center's policies required that the child see the nurse. According to Boone, Antonia was asleep when she came on duty. Boone spoke with Charles, the worker from the previous shift, about the babies.

Boone testified in her deposition that when she arrived at her shift at 8:00 a.m., she was the only childcare worker there.  Boone requested assistance from her supervisors, but it is unclear exactly when such assistance arrived.  Boone testified that childcare workers Allison Porter ("Porter") and Sybil Deans ("Deans") were sent to assist, and that she obtained help within ten to fifteen minutes.  However, other evidence in the record, relied upon by the City Defendants, suggests that Porter did not arrive until 9:50 a.m.  It is unclear when Deans arrived.  Thus, the record is ambiguous as to how long Boone was alone on the shift.  Six children were present during Boone's shift, although whether the six children were present throughout the entire shift is unclear.

Porter changed Antonia, and recalled that Antonia was in a good mood, was laughing and playing, and was given juice to drink.[10]  Porter left the nursery at around 11:40 a.m., at which point Antonia was still awake and playing.  Boone fed

_____

[10] The exhibit from which this fact derives actually states that Antonia was laughing and playing "with another child."  (Mem. from Allison Porter to Willie Maye, Jr., dated Jan. 29, 2003, attached as Ex. Y to Halbardier Aff., at NYC 1976.)

-18-

Antonia juice and changed her diaper prior to taking her lunch break.  Plaintiffs dispute these facts as misleading, but it is unclear exactly they dispute.  Plaintiffs point to exhibits and deposition testimony suggesting that Boone, Porter, and another childcare worker, Alicia Felipe ("Felipe") each changed Antonia's diaper at various points between 8:00 a.m. and 12:30 p.m., and that Antonia may have been in the stroller at some points during this time period.

Around 12:30 p.m., Antonia was taken to the nurse's station by a childcare worker for a daily vital sign check. Nurse Carmen Nieves ("Nieves"), who has been a registered nurse since 1977, was told by the childcare worker that Antonia had a good appetite, was voiding and sleeping well, and was awaiting placement.  Nieves wrote in her notes that Antonia "appears comfortable ... very alert ... in no apparent distress."  (ACS Integrated Progress Notes, attached as Ex. J to Halbardier Aff., at NYC 0960.)  Nieves took Antonia's temperature under the armpit, which could be a few degrees different from a rectal reading, and found that it was 96.9 degrees.  Nieves remembered that Antonia did not look like she was sick, and that the only unusual thing she noticed was that Antonia had clubbing in her feet.

Antonia then returned to the nursery with the childcare worker.  Felipe took Antonia out of the stroller and played

with her; Antonia was smiling, playfully energetic, and fully alert; Felipe changed her diaper; and Antonia crawled around.[11]

During the afternoon, Boone recalled playing with Antonia, who was happy and laughing at Boone's funny faces. Boone noticed nothing unusual about Antonia's condition. Deans also interacted with Antonia, who laughed when Deans tickled her. It is undisputed that during this time, Antonia did not interact with any other children.

That afternoon, Boone tried to feed Prosobee to Antonia, but Antonia spit it up, so she gave her water and juice instead. Plaintiffs contend that Antonia did not merely spit up but instead vomited. Plaintiffs' evidence for this contention consists of (1) Boone testifying that Antonia spit up, and then agreeing when asked if Antonia "regurgitated," and (2) the Foster Agency Defendants' and Plaintiffs' experts defining "regurgitation" to mean "vomiting." (Deposition of Dr. Cindy Christian, dated Sept. 9, 2005 ("Christian Dep."), attached as Ex. B to First Vanderpuye Aff., at 150; Deposition

---

[11] Plaintiffs dispute these facts on the grounds that they are "unsworn hearsay from a non-party witness." (Pl. Rule 56.1 Response (City) ¶ 32.) The allegations derive from a memorandum dated January 29, 2003 to Maye from Felipe, incorporated into the City's file on Antonia from the Office of Confidential Investigations (see Ex. Y to Halbardier Aff., at NYC 1977), and may meet several of the hearsay exceptions, such as a recorded recollection, or may be non-hearsay if it is offered not for its truth but, for example, to reflect any relevant state of mind of the childcare workers. Such documents could also be statements of a party-opponent or its agents and thus admissible non-hearsay under Federal Rule of Evidence 801(d)(2). See Amnesty America v. Town of West Hartford, 361 F.3d 113, 131 n.13 (2d Cir. 2004). It is not improper for the City Defendants to rely on this exhibit to support their Rule 56.1 Statement.

of Dr. Steven Lloyd Kugler, dated Aug. 11, 2005 ("Kugler Dep."), attached as Ex. C to First Vanderpuye Aff., at 128.) However, Boone stated that Antonia did not vomit, that her understanding of "regurgitate" means "to bring back; to bring up something," and that Antonia "didn't take enough to vomit." (Deposition of Esther Boone, dated June 7, 2005, attached as Ex. S to Halbardier Aff., at 37-39.)   The Court declines to resolve whether or not, on the basis of Boone's ambiguous testimony, a reasonable factfinder could draw a "justifiable inference" that Antonia had vomited, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), because this issue ultimately has no bearing on the Court's determination of the instant motions.[12]

Dalrymple worked the 4:00 p.m. to midnight shift on January 23, 2003.  When she arrived, Dalrymple brought Antonia to the nurse's station to have her temperature checked, and to

---

[12] For example, whether Antonia had vomited at some point prior to or during her transfer to Cartagena may have been relevant to proving when Antonia was injured.  However, the City Defendants have conceded for purposes of their summary judgment motion that Antonia was injured prior to leaving the ACS pre-placement facility.  Therefore, disputed facts related to the timing of the injury are not relevant to the instant motion.  Similarly, whether Antonia had vomited at that point could have been relevant to whether certain defendants were deliberately indifferent to Antonia's medical needs.  However, Boone is not a named defendant, so whether Antonia vomited in her presence is irrelevant to the resolution of the instant motion.  Finally, if Antonia had vomited during the time frame in question, but ACS workers did not respond appropriately, such facts conceivably could be relevant to whether City employees were appropriately trained and the City was deliberately indifferent to the need for more training.  However, as will be set forth below, Plaintiffs have failed to raise a genuine issue of material fact as to the adequacy of the ACS workers' training.  Thus, the dispute over whether Antonia vomited at this point is of no import at this stage of the proceedings.

see if she could give her formula since Antonia had been drinking only juice. Plaintiffs contend that these allegations are misleading, because a child would be brought to the nurse's station a second time only if the child were in distress. Albano was present and took Antonia's temperature, which she recalled was 99 degrees and which she considered normal. In addition, Albano held Antonia and observed that she was happy, active and alert. However, Plaintiffs point out that Albano did not document Antonia's temperature or any of these observations. Dalrymple returned with Antonia to the nursery from the nurse's station, fed Antonia formula, and changed her diaper. She recalled that Antonia was a "nice baby" who was physically fine during the shift and did not cry. Plaintiffs dispute the veracity of Dalrymple's testimony but point to nothing in her statements or other evidence to support their contention.

Lorraine Pitts ("Pitts"), who has worked for ACS for four years, was present in the nursery with Dalrymple on the 4:00 p.m. to midnight shift on January 23, 2003. According to the City Defendants, Antonia was happy, smiling, and laughing, and did not vomit during the time Pitts was with her. Plaintiffs dispute these allegations based on Cartagena's testimony that the bag that came with Antonia had clothing with vomit on it, as well as Pedialyte, which is given to infants suffering from

vomiting or diarrhea, and that Pitts packed the bag.  Pitts testified that she packed the bag with Prosobee, not Pedialyte.

At about 8:00 p.m. on January 23, 2003, Pitts learned that Antonia's placement was ready.  Another childcare worker, Ruby Browning ("Browning"), dressed Antonia.  Antonia left the nursery at 8:15 p.m.  Pitts and Browning took Antonia and her belongings downstairs together to the waiting area, where another worker, Amanda Audige ("Audige") was waiting, and they gave Antonia to Audige.

On the record before the Court, there is no evidence that during the time that Antonia was at the Children's Center, incident reports concerning her were prepared, or that any one reported any unusual incidents.  Moreover, there is no indication that any children staying at the Children's Center were receiving psychotropic drugs on January 22 or 23, 2003.

All of the ACS childcare and medical staff who worked with Antonia were cleared by the New York State Central Child Abuse Registry and underwent criminal background checks before working at the Children's Center.  There is no evidence before the Court that any of these employees has ever been accused of or involved in injuries to children under their care, whether accidental or non-accidental.  Plaintiffs contend that these facts are misleading because the background checks are limited

-23-

to "official reports and convictions" (Pl. Rule 56.1 Response (City) ¶ 41); however, Plaintiffs do not present any evidence of unofficial accusations or suggest what additional information such background checks might include.

D.    ANTONIA'S TRANSPORTATION TO THE FOSTER HOME

Defendant Shemain Webb-Alexander ("Webb-Alexander"), who has worked for ACS for three years, asserted that she works in intake and transports children to foster homes, and that no baby has ever been injured while she was transporting children.   She has never been convicted of a crime or disciplined for any reason.

Audige was in the waiting room with Antonia the entire time Webb-Alexander finished getting ready to transport Antonia to the foster home.   Once Antonia was ready, Webb-Alexander carried her to the transport van and placed her in a car seat.   Webb-Alexander sat next to Antonia in the row behind the driver.   A teenager who was also being transported was in the van and sat in the back row.   The van left the Children's Center at 8:56 p.m. on January 23, 2003.

During the ride, Antonia began to cry a bit.   Webb-Alexander reached into the duffle bag and fed Antonia five to six ounces from an eight-ounce bottle of milk.   Antonia did not cry again, and she did not vomit during the ride.   Again, Plaintiffs dispute the "veracity" of these allegations, but

-24-

cite to no contradictory statement or other evidence to support their challenge.

There were no accidents or bumps during the van ride, and Webb-Alexander asserted that she did not remove Antonia from the car seat during the ride.  They reached the foster home at 9:39 p.m. on January 23, 2003, at which time Webb-Alexander took Antonia out of the car seat and handed her to Cartagena.

At the foster home, Webb-Alexander accompanied Cartagena inside the apartment.  The parties dispute whether Antonia vomited at this point.  According to the City Defendants, Webb-Alexander noticed that there was some milk on Antonia's chin from when she had fed her, and she told Cartagena that she had just fed Antonia.  Cartagena, however, testified that Antonia vomited in front of Webb-Alexander when Webb-Alexander took her into the foster home, at which point Webb-Alexander explained that the baby had just drank milk.

According to the City Defendants, while in Cartagena's apartment Webb-Alexander observed Antonia's face, and saw no marks or bruises; Antonia was smiling and appeared to be happy in the home while Gonzalez, the foster father, held her.  Plaintiffs dispute the veracity of these facts, adding that Cartagena testified that she observed red marks around the infant's eyes when she was dropped off.  Webb-Alexander observed a crib where Antonia was to sleep, and left the

-25-

foster home at 9:55 p.m.

Plaintiffs and the Foster Agency Defendants, relying on Cartagena's deposition and affidavit, agree that when Webb-Alexander brought Antonia up to Cartagena's apartment, Cartagena observed that Antonia had little red dots around her eyes. According to the Foster Care Defendants' expert Dr. Cindy Christian ("Christian"), these dots were "petechiae" – bruises that are signs and symptoms of inflicted head trauma. (See Aff. of Cindy Christian, M.D., dated Dec. 1, 2005, ¶ 5(c) (submitted in support of Foster Agency Defendants' Motion); see also Christian Dep., at 29-31.)   The City Defendants dispute that Antonia had such marks, pointing out that Webb-Alexander did not notice any such bruises or marks, and additionally contending that Cartagena has provided differing descriptions of Antonia's condition at that time.[13]   Webb-

---

[13] The evidence to which the City Defendants point contains different descriptions of Antonia's condition purportedly provided by Cartagena, but these descriptions are not necessarily inconsistent.  Hospital intake records state that Antonia "was apparently well" prior to stopping breathing in the van; however, these records also state that Antonia had a "bruise on both upper eyelids noted during initial presentation." (Bronx-Lebanon Hospital Center, Summary for Inter-Institutional Transfer of Patient, attached as Ex. X to Halbardier Aff., at BL 9.)  A police department complaint form, summarizing a February 4, 2003 interview with Gonzalez, the foster father, reports that Gonzalez stated that Cartagena had commented on January 24, 2003 at 8:00 a.m. that Antonia had a red mark on her eyelid.  (Complaint Form, dated Feb. 4, 2003, attached to Ex. GG to Halbardier Aff., at 000441.)   Part of the City's confidential investigation file reports that when Cartagena was interviewed, she stated that Antonia had vomited once while in her care but that overall was a well child.  (New York City Confidential Report, dated Apr. 15, 2003, at NYC 1556.)   However, this same confidential investigation file also indicates that when Cartagena was interviewed by Child Protective Services and detectives, she stated that she saw a faint red mark on Antonia's eyelids but did not think anything of it because the transportation worker had told her that Antonia was medically seen before arrival.  (See id. at

-26-

Alexander told Cartagena that Antonia had been "medically seen" or "medically cleared" at ACS before she was brought to Cartagena.   (CHB R. 56.1 Statement ¶ 13; see Deposition of Shemain Webb-Alexander, dated Feb. 16, 2005, attached as Ex. N to Declaration of Glen Feinberg, dated Dec. 1, 2005 ("Feinberg Decl."), at 38; Statement of Webb-Alexander, undated, attached as Ex. V to Halbardier Aff., at NYC 1545.)[14] Webb-Alexander did not tell Cartagena that Antonia had any medical condition requiring emergency treatment, and stated that she should bring Antonia to the doctor the following Monday as a matter of routine.   The City Defendants add that Webb-Alexander, in both a statement to her supervisor and in her deposition, indicated that she told Cartagena to contact the assigned caseworker the next day for more information on Antonia.[15]

E.   TIMING OF THE INJURY

Exactly when and where Antonia was injured is disputed.

---

1615.)  Although not referred to by the parties, the Court notes that a January 31, 2003 memorandum from Seda, summarizing a CHB interview the previous day with Cartagena and Gonzalez, states that Cartagena noticed red spots around Antonia's eyes.  (See Memorandum from Marina Seda, dated Jan. 31, 2003, attached as Ex. W to Halbardier Aff., at 2.)  There may be a genuine issue of fact as to whether Antonia had red marks on her face upon arrival at Cartagena's home.  However, the City Defendants' objection goes largely to the credibility of Cartagena's testimony.

[14] The City Defendants agree but point out that Webb-Alexander also told Cartagena that she needed to contact her agency worker the next day for more information.

[15] This fact is asserted not in support of the City Defendants' own motion, but in response to the Foster Agency Defendants' motion.

The City Defendants assert that Antonia was injured while in the custody of the foster parents; Plaintiffs and the Foster Agency Defendants contend that Antonia was injured – and indeed sustained an inflicted head trauma - while still at the ACS pre-placement facility.  Each party has an expert who will testify to its respective version of the timing.  However, solely for purposes of their summary judgment motion, the City Defendants assume that the injury occurred before Antonia was given to the foster parents.

_____Many of the disputed details of Antonia's stay at the ACS facility – such as whether she cried during the shift, whether she had a fever, whether she vomited, and whether her bag was packed with Pedialyte or Prosobee – are largely relevant to the timing of her injuries.  Since the City Defendants concede, solely for purposes of summary judgment, that the injury occurred prior to Antonia leaving the ACS facility, these disputes are thus essentially irrelevant to the City Defendants' position at this juncture.

F.____ANTONIA'S STAY AT THE FOSTER HOME

_____Cartagena and Gonzalez were foster parents selected and approved through CHB.  Both had received clearances from the State Central Register, and neither had a criminal history prior to their approval as foster parents.  They had received training on shaken baby syndrome.  They also signed an

agreement with Catholic Home Bureau, which included guidelines on safety and care of children in their care.

It is undisputed that CHB conducted a thorough investigation into Cartagena's and Gonzalez's qualifications as foster parents, and that Cartagena and Gonzalez completed the required training and were duly licensed as foster parents.

During the night of January 23, 2003 to the morning of January 24, 2003, Antonia cried, slept poorly, and did not want to drink formula.[16]  Cartagena also testified that on January 24, 2003, Antonia did not want to drink formula and vomited "a very little bit in terms of the way she had done it the first time."  (Deposition of Cielo Cartagena, Mar. 22, 2005 ("Cartagena Dep."), attached as Ex. F to First Vanderpuye Aff., at 50.)[17]

1.   Phone Conversation Between Seda and Cartagena

At about noon on Friday, January 24, 2003, Cartagena called and spoke with CHB employee Seda about Antonia.  The parties have not provided the Court with a description of

---

[16]  The City Defendants dispute this based on their contention that Cartagena has provided differing descriptions of Antonia's condition. However, the City Defendants raise their objection in response to Foster Agency Defendants' motion, not in support of their own.  As this dispute is not relevant to the motion for summary judgment filed by the Foster Agency Defendants against Plaintiffs, the Court does not assess the City Defendants' dispute here.

[17]  The City Defendants dispute these facts, but again do so in response to the Foster Agency Defendants' motion.

Seda's position and responsibilities at CHB; however, the
Court notes that Seda testified in deposition that she was an
administrative assistant to the intake coordinator.
(Deposition of Marina Seda, dated March 23, 2005 ("Seda
Dep."), attached as Ex. M to Feinberg Decl., at 5-6.).  The
substance of the conversation is disputed, both in terms of
what Cartagena relayed to Seda, and how Seda responded.
According to the Foster Agency Defendants, Cartagena told Seda
that Antonia was "gemeriquiando" – a Spanish word meaning
fussy, moaning, and groaning - (CHB R. 56.1 Statement ¶ 22),
that she woke many times during the night, and that she
vomited.   In response, according to the Foster Agency
Defendants, Seda told Cartagena to take Antonia to the
hospital "as soon as possible."  (Id. (quoting Seda Dep. at
27).)

     Plaintiffs assert that Cartagena relayed to Seda not only
the above details, but additionally that Antonia's bag
contained dirty clothes with vomit on them, that Antonia had
arrived dirty and soiled, that Antonia was very skinny and
looked sick, that something was wrong with Antonia, and
Antonia had red markings around both her eyes.  Yet, according
to Plaintiffs, Seda did not advise Cartagena to take Antonia
to a hospital or even a doctor immediately; rather, she told
her to do so only as a matter of routine, within 48 hours of

receiving Antonia.

The Court's own examination of Seda's and Cartagena's deposition testimony reveals that the record comports with both sides, and the differences in the two sides' accounts results from selectively quoting the record. Seda testified that Cartagena stated that Antonia was "very fussy, that she was vomiting and that she was up the night with her," and "generally just that she was moaning ... *gemeriquiando*," and that she "barely slept." (Seda Dep. at 26-27.) Cartagena related that she had been told Antonia could drink regular milk, but that the baby had arrived with formula as well; in response, Seda stated that Cartagena should "use what they gave her and ... take her to the hospital or to the doctor <u>as soon as possible</u> and there they would give her a letter for WIC and WIC would give her the right milk." (Seda Dep. at 27-28 (emphasis added).)

Yet Seda also testified that when she told Cartagena to take the baby to the doctor as soon as possible, Cartagena informed her that she had been told that Antonia was medically cleared and did not have to go to the doctor until Monday. (<u>See</u> <u>id.</u> at 29.) Seda understood "medically cleared" to mean that Antonia "is fine, that she is stable ... she is okay." (Seda Dep. at 29-30.) When Seda was asked in her deposition if there was "any reason why you did not tell [Cartagena] to

-31-

take the child to the doctor immediately," she responded that "[r]outine would state that it is within 48 hours, this is in training and it is something understood, so as soon as possible within that time frame.  And the child, from what she described, seemed normal for a child who had been yanked away from the family.  They are fussy, they cry, they are not comfortable."  (Id. at 28.)   Later in the deposition, Seda recalled that Cartagena may have also told her that Antonia had red marks around her eyes.  (See id. at 29.)  She further related that Cartagena told her that Antonia had arrived dirty and soiled, with a bag containing dirty clothes with vomit on them, that she was very skinny and looked sick, and that something was wrong with Antonia.  (See id. at 82-83.)  Finally, Seda testified that she "felt the child was sick" but did not know what was wrong.  (Id. at 85-86.)

    Similarly, the Court's examination of Cartagena's testimony reveals that Cartagena testified that called she Seda because Antonia had arrived with formula, but the documentation with her indicated that she was to receive milk, and she did not want to give Antonia milk that would harm her stomach.  (See Cartagena Dep., at 37, 39.)  By Cartagena's account, she told Seda that Antonia "was crying; that she was sad," and Seda responded that "perhaps the baby missed her mother."  (Id. at 37.)  Also according to Cartagena, Seda

-32-

informed her that she needed to go to WIC, "[s]o that they could take her blood and they could give her the milk that she needed to have."  (Id. at 37-38.)

Seda did not contact CHB's medical unit about the conversation she had with Cartagena, nor did she refer Cartagena to the medical unit.  Plaintiffs point out that Seda testified that she is aware that when a child is not taking food and vomiting, there is a danger of dehydration.

2.   Events on January 25, 2003

On January 25, 2003, Cartagena and Gonzalez took Antonia and their young child Jean Gonzalez with them in the family van to perform various errands.   In the afternoon, they stopped at a tax preparation office, and Cartagena went inside while Gonzalez remained in the van with Antonia.   At some point while in the van with Gonzalez, Antonia became limp and unresponsive.  All parties agree that at this point, Antonia had become "obtunded," or nearly comatose.  The Foster Agency Defendants pinpoint the time as shortly before 2:00 p.m., while Plaintiffs estimate that Cartagena found Antonia unresponsive at about 1:20 p.m. to 1:25 p.m.  Hospital records indicate the time of the event as 1:30 p.m.

Cartagena and Gonzalez drove Antonia directly to Bronx-Lebanon hospital, which was approximately 2.6 miles away. However, Plaintiffs point out that Cartagena and Gonzalez did

not know the location of the nearest hospital and did not
arrive at the hospital until 2:10 p.m.  The City Defendants
also contend that they arrived at the hospital at 2:10 p.m.
The Foster Agency Defendants do not specify the exact time of
Antonia's arrival at the hospital, but assert that it was
within 10 minutes after Antonia became obtunded.  In support,
they point to Cartagena's affidavit, in which she averred that
they arrived at the hospital "in less than ten minutes."
(Cartagena Aff., dated Nov. 30, 2005, attached as Ex. H to
First Vanderpuye Aff.).   Cartagena also testified in
deposition that she arrived at about 2:00 p.m. (See Cartagena
Dep. at 73.)   Hospital records indicate that Antonia was seen
in triage at 2:10 p.m.  (See Bronx Lebanon Hospital Records,
attached as Ex. A to First Vanderpuye Aff., at BL-3.)

At Bronx Lebanon Hospital, Antonia was diagnosed with
severe injuries, including a head injury.  She was thereafter
transferred to Montefiore Hospital.   The City Defendants
contend that these injuries were non-accidental and the result
of child abuse.   To support this assertion, the City
Defendants point to:  (1) the November 2004 determination of
the Family Court, in a proceeding charging derivative child
abuse of Cartagena's and Gonzalez's five-year-old daughter,
that Gonzalez intentionally inflicted severe physical abuse on
Antonia while in his care; (2) a letter from Eli Newburger, a

-34-

pediatrician serving as an expert for the City Defendants; and
(3) a description proffered by Dr. Steven Kugler ("Kugler"),
Plaintiffs' expert, of Antonia's injuries as non-accidental.
Plaintiffs contend that these allegations are misleading,
because the testimony of Kugler and CHB's expert Christian
suggest that Antonia's injury occurred 48 to 72 hours prior to
the time that Cartagena took Antonia to the hospital, and thus
occurred while Antonia was still in the custody of the ACS
pre-placement facility.

### III.   CLAIMS

In their Corrected Second Amended Complaint (the
"Complaint"), Plaintiffs assert several causes of action.
Count One asserts that Antonia was removed from the care and
custody of Green without due process.[18]  Count Two asserts both
that (1) the defendants negligently placed and supervised
Antonia in a foster home, and (2) Antonia was assaulted by the
defendants.  Count Three asserts a claim by Green and Phillips
for "tortious interference with and violations of substantive
due process," specifically that the injuries sustained by
Antonia at the hands of the defendants deprived the parents of

---

[18] Although Count One is styled as a claim for "negligent and illegal
removal under 42 U.S.C. § 1983, procedural due process and New York State
laws,"  it is unclear what state law violations are part of this Count.
The City  Defendants have treated Count One as a claim solely for federal
due process violations, and Plaintiffs have not argued otherwise.

their constitutional rights to the care and custody of Antonia. Count Four asserts claims against the City, ACS (even though ACS is not named as a defendant), and Catholic Home Bureau under 42 U.S.C. § 1983, Monell v. Department of Social Services, 436 U.S. 658 (1978), and state law for negligent hiring, training, and supervision of its employees.

Count Five is a request for punitive damages, and Count Six is a request for attorneys' fees and costs.

## IV.  LEGAL STANDARD

In order to prevail on a motion for summary judgment, the moving party must demonstrate that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. In determining whether genuine issues of material fact exist, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). "'[I]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.'"

-36-

Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001) (quoting Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000)).

The nonmovant, however, cannot create a genuine issue of fact through "conclusory allegations, conjecture, and speculation." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir. 1994). In the face of a properly supported motion for summary judgment, the opposing party cannot "get to a jury without 'any significant probative evidence tending to support' [the existence of a disputed fact]." Anderson, 477 U.S. at 249 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).

### V.  DISCUSSION OF CLAIMS ASSERTED AGAINST CITY DEFENDANTS

A.  CLAIMS ARISING FROM ANTONIA'S REMOVAL FROM HER PARENTS' CUSTODY

Counts One and Three allege due process violations arising from Antonia's removal from the care and custody of her parents. Count One alleges that the removal violated Green's and Antonia's procedural due process rights, while

-37-

Count Three asserts a substantive due process claim by Green and Phillips, specifically that the removal of Antonia deprived the parents of their constitutional rights to the care and custody of Antonia.[19]

The City Defendants argue that these claims must be dismissed because under the Rooker-Feldman doctrine, this Court lacks subject matter jurisdiction to review final removal and custody orders issued by the Family Court.

Under the Rooker-Feldman doctrine, federal district courts lack jurisdiction over suits "that are, in substance, appeals from state-court judgments." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005); see also Sindone v. Kelly, 439 F. Supp. 2d 268, 271 (S.D.N.Y. 2006). The doctrine derives from the mandate that under statutes governing the federal judiciary, district courts are "empowered to exercise original, not appellate, jurisdiction." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283 (2005); Holblock, 422 F.3d at 83-84.

---

[19] Although the City Defendants characterize Count Three as relating solely to the initial removal of Antonia, rather than to the subsequent injuries she sustained, Count Three also appears to encompass a substantive due process claim grounded on the severe and permanent injuries suffered by Antonia that interfered with Plaintiffs' parent-child relationship. See Mem. of Law in Opp'n to the City of New York, et al., Mot. for Summ. J., dated Jan. 30, 2006 ("Pl. Mem."), at 1 ("Antonia's current condition and the permanent loss of the normal parent child relationship stemming from the same is a direct and proximate consequence of the Defendants' misconduct.") (emphasis added). Whether such a claim is encompassed by the substantive due process guarantees of the Constitution will be discussed later. For now, however, the following discussion of Count Three addresses only those aspects arising from Antonia's removal from her parents' custody.

In 2005 the Supreme Court, observing that federal courts, including the Second Circuit, had incorrectly interpreted Rooker-Feldman to encompass and even supersede ordinary preclusion principles, held that the doctrine was not co-extensive with preclusion but rather, "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon, 544 U.S. at 284.

In light of Exxon, the Second Circuit re-examined Rooker-Feldman in Hoblock and set out four requirements for its application, two procedural and two substantive. Procedurally, the federal court plaintiff must have lost in state court, and the state court judgment must have been rendered before the district court proceedings commenced. Substantively, the plaintiff must complain of injuries caused by a state court judgment, and the plaintiff must invite district court review and rejection of that state court judgment.   See Hoblock, 422 F.3d at 85.   If these four conditions apply, the federal court lacks subject matter jurisdiction to adjudicate the suit.

1.   Rooker-Feldman's Procedural Requirements Are Met

Here, Rooker-Feldman's two procedural requirements are

-39-

met:  Plaintiffs lost in state court when the Family Court
signed the January 24, 2003 Order granting remand of Antonia
to ACS, and that judgment was rendered prior to commencement
of this federal lawsuit.  Plaintiffs argue that, for Rooker-
Feldman purposes, there is no judgment rendered before
commencement of district court proceedings, because state
court custody proceedings are ongoing and there has been no
final termination of parental rights.  However, Plaintiffs are
not challenging a petition for termination of parental rights,
but the removal of Antonia from Green's custody, which arose
out of ACS workers' concerns over violations of the November
18, 2002 Order and was authorized by the Family Court in its
January 24, 2003 Order directing removal of the child pending
further proceedings, which Order has become final.[20]

The Court pauses to address this point further because
Family Court proceedings related to the claims at issue in
this action remain pending, and that fact merits further
explication in light of Hoblock's caution that Rooker-Feldman
"has no application to federal-court suits proceeding in
parallel with ongoing state-court litigation."  Hoblock, 422
F.3d at 85.

---

[20] That the Order was issued after the caseworkers had already acted to
remove Antonia raises an issue of whether Antonia's constitutional claim
stems from the caseworkers' actions or the state court judgment.  This
question will be addressed below in the section on Rooker-Feldman's
substantive requirements.

The Second Circuit observed in Hoblock that although Rooker-Feldman's timing requirement will usually be straightforward, in that most commonly the federal suit will commence after the state suit has unequivocally terminated, "federal suits challenging interlocutory state judgments may present difficult questions as to whether 'the state proceedings have "ended" within the meaning of Rooker-Feldman on the federal questions at issue.'" Id. at 89 (quoting Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico, 410 F.3d 17 (1st Cir. 2005)). In making this observation, the Second Circuit cited to Federacion, a First Circuit case that examined at length how Rooker-Feldman applied to interlocutory state court judgments. The First Circuit concluded that Rooker-Feldman did indeed bar a federal suit that would have required the federal district court to review and reject an interlocutory determination of a Puerto Rican court that federal law did not preempt the state court proceedings. In reaching this conclusion, the Federacion court noted that all Exxon states is that Rooker-Feldman bars a federal lawsuit where "'the losing party in state court filed suit in federal court after the state proceedings ended.'" See Federacion, 410 F.3d at 24 (quoting Exxon, 544 U.S. at 291) (emphasis added). Federacion explored the meaning of "after the state proceedings ended," and

concluded that for purposes of Rooker-Feldman, state proceedings will have "ended" in three situations, which are not limited to situations of a final judgment under 28 U.S.C. § 1257 ("§ 1257"), even though Rooker-Feldman arose out of § 1257.  Id.  First, a state proceeding has "ended" when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved.  Id. Second, a state proceeding has "ended" if the state action has reached a point where neither party seeks further action.  For example, if a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended for Rooker-Feldman purposes, even though this judgment is usually not appealable under § 1257. Id.  Third, a state proceeding has "ended" if all federal questions have been finally resolved in the state court proceedings, but state law or purely factual questions remain. Id. at 25.  In other words, "Rooker-Feldman applies where the state proceeding has ended with respect to the issues that the federal plaintiff seeks to have reviewed in federal court, even if other matters remain to be litigated."  Id. at 26 (emphasis in original).[21]

---

[21] The First Circuit inferred this third meaning of "ended" from a footnote in Exxon that provided an example of a federal suit that would be barred by Rooker-Feldman even though state court litigation was ongoing: a federal suit seeking to invalidate a state statute governing mineral leases, brought after a state supreme court reversed a lower state court's determination that such statute was invalid and remanded to the lower

Although <u>Federacion</u>'s analysis of this issue concerning when a state court proceeding has "ended" has not been formally adopted by the Second Circuit, this Court is persuaded by <u>Federacion</u>'s reasoning and concludes that the Court lacks jurisdiction to hear Plaintiffs' challenge to the Family Court's removal Order. Although state court proceedings regarding termination of parental rights are ongoing, the issue that Plaintiffs seek to have adjudicated here is whether Antonia's initial removal effectuated by the January 24, 2003 Order was wrongful. State court proceedings as to this issue have ended. The January 24, 2003 Order was issued, and the time to appeal that Order expired. Thus, the state court removal Order falls into <u>Federacion</u>'s second situation: the state court issued an Order on January 24, 2003 directing removal of Antonia, pending further hearings, and Plaintiffs did not challenge that Order but let the time to appeal expire.[22]

To the extent that the removal proceedings had not

court with instructions to enter summary judgment for the plaintiffs and to consider what further relief, if any, might be appropriate. In such a case, state court proceedings would be ongoing, but the proceedings as to the federal issue of invalidation of the state statute would have "ended" for <u>Rooker-Feldman</u> purposes. <u>See</u> <u>Exxon</u>, 544 U.S. at 287 n.2; <u>Federacion</u>, 410 F.3d at 25-26.

[22] The January 24, 2003 Order stated that pursuant to Section 1113 of the Family Court Act, an appeal needed to be taken within 30 days of receipt of the Order by appellant in court, 35 days from the date of mailing of the Order to appellant by the clerk of court, or 30 days after service by a party or the law guardian upon the appellant, whichever is earliest.

"ended" in that the January 24, 2003 Order stated that it was subject to further factfinding, such factfinding occurred and the Family Court issued an order on March 28, 2003, finding that Green had indeed violated the November 18, 2002 Order and thus that Antonia's removal was appropriate.  This March 28, 2003 order also was not appealed, and the time to do so has expired.  Additional factual questions remain as to whether termination of parental rights and adoption are appropriate in this case, but the initial removal decision was fully assessed by the state court and found to be proper.  State court proceedings as to this issue have ended, and thus Rooker-Feldman's procedural requirements are satisfied.[23]

    2.   Rooker-Feldman's Substantive Requirements Are Met

With regard to Rooker-Feldman's substantive requirements, Plaintiffs argue that their due process claims do not arise out of the state court orders because the wrongful act they complain about is not the removal of Antonia, but rather, the alleged due process violations, or specifically, the "misconduct of the defendants in violating their own due process requirements." (Pl. Mem. at 12.)  In other words,

---

[23] The Court recognizes that to some extent the ongoing state court proceedings are interlaced with the custody removal at issue here, in that the state court's determination that the children needed to be and were removed from their parents most likely formed the basis for subsequent proceedings regarding termination of parental rights.  Despite this issue, the relevant federal injury alleged here is Antonia's initial removal and that such removal was done without due process.  As determined above, state court proceedings as to this issue have ended.

since the allegedly unconstitutional removal occurred prior to the January 24, 2003 Order, the wrongful conduct had already occurred and the state court order merely ratified or acquiesced in the constitutional violation complained of, but did not cause it.  In this regard, Plaintiffs cite <u>Hoblock</u>, which explained that "[a] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state court judgment <u>and</u> <u>not</u> <u>simply</u> <u>ratified</u>, <u>or</u> <u>left</u> <u>unpunished</u> <u>by</u> <u>it</u>."  <u>Hoblock</u>, 422 F.3d at 88 (emphasis added).

Whether an injury is caused by a state judgment is "the core requirement" of <u>Rooker-Feldman</u>, from which the other requirements derive.  <u>Id.</u> at 87.  Thus, the key inquiry is the source of the injury.  In a case where, as here, a plaintiff purportedly challenges a third party's actions, the challenge is to determine whether the third party's actions are caused by the state court judgment, or are simply ratified by it.  The formula laid out by the Second Circuit in <u>Hoblock</u> for determining whether a federal suit complains of injury from a state court judgment or from third party actions, is the following:

> [A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply

-45-

> ratified, acquiesced in, or left unpunished by it.  Where
> a state-court judgment <u>causes</u> the challenged third party
> action, any challenge to that third-party action is
> necessarily the kind of challenge to the state judgment
> that only the Supreme Court can hear.

<u>Id.</u> at 88 (emphasis added).

In some circumstances, that a third party's actions are not caused by a state judgment is clear.  For example, if a public employee is fired by his agency, brings a state court suit for employment discrimination, loses, and then sues in federal court, the federal court has jurisdiction, because the injury complained of is the termination from employment by the agency – the injury was not caused by the state court judgment, even though the state court in essence "ratified" the injury by not finding for the plaintiff.  <u>Hoblock</u>, 422 F.3d at 88; <u>see also</u> <u>Sindone</u>, 439 F. Supp. 2d at 274 (holding that <u>Rooker-Feldman</u> did not bar police officer's § 1983 claim for termination of employment, because the source of the injury was his dismissal by the police department and not the state court judgment affirming the police department's actions).  Of course, the claim might still be barred under ordinary preclusion principles, but the federal court nonetheless has jurisdiction to consider the action.  <u>See</u> <u>Hoblock</u>, 422 F.3d at 88 n.6.

Likewise, in some circumstances, that a third party's actions <u>are</u> caused by a state judgment is equally clear.  For

-46-

example, where a plaintiff challenges a Board of Elections'
refusal to tally votes, if in refusing to tally votes the
Board is "acting under compulsion of a state-court order," the
injury is caused by a state court judgment even though the
plaintiffs purportedly complain of actions by a third party.
Id. at 88.   Similarly, in Galtieri v. Kelly, the plaintiff
sued a pension fund administrator under § 1983 for due process
violations in garnishing his pension; however, Rooker-Feldman
barred the suit because the pension fund administrator was
acting pursuant to an earlier state court order directing that
the pension be garnished for alimony payments.   No. 05 Civ.
4798, 2006 WL 1720392, at *5-*6 (E.D.N.Y. June 19, 2006).

In an example particularly relevant to this case, Hoblock
posited:

> [s]uppose a state court, based purely on state law,
> terminates a father's parental rights and orders the
> state to take custody of his son. If the father sues in
> federal court for the return of his son on grounds that
> the state judgment violates his federal substantive
> due-process rights as a parent, he is complaining of an
> injury caused by the state judgment and seeking its
> reversal. This he may not do, regardless of whether he
> raised any constitutional claims in state court, because
> only the Supreme Court may hear appeals from state-court
> judgments.

422 F.3d at 87.

Here, Plaintiffs' claim is arguably distinguishable in
that in the above example, the parent sues on grounds that the
"state judgment" violated his due-process rights, while in

-47-

this case the parents are suing on grounds that the caseworkers' actions, not the judgment itself, violated their due process rights.  Yet to allow such a claim to go forward would be to reward artifice and artful pleading – because although Plaintiffs do not state explicitly that they are challenging the state court judgment, in substance they are: not only did the state court judgment authorize the removal of Antonia's parental custody, but that judicial action was a prerequisite to effectuate a valid removal of a child from her parents.  As Hoblock explains:

> Can a federal plaintiff avoid Rooker-Feldman simply by clever pleading – by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself? Surely not.  In the child-custody example given above, if the state has taken custody of a child pursuant to a state judgment, the parent cannot escape Rooker-Feldman simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child.  The example shows that in some circumstances, federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments.

Id. (emphasis added).

The twist in this case is that the state court order directing custody removal was issued after Antonia had already been removed.  At first glance, this circumstance might seem as if Plaintiffs' claims of constitutional injury stemmed from the caseworkers' actions, and the state court's order two days later merely ratified those actions.  Had the Family Court

-48-

hearing happened first, there would be no doubt that the state court judgment caused the relevant injury for Rooker-Feldman purposes.   A post-removal hearing creates more of a theoretical difficulty.  Yet, although intuitively it might seem that in a post-removal hearing, the Family Court merely "ratifies" the alleged constitutional injury rather than causes it, here it makes more sense to conclude that the Family Court order did cause the claimed injury - i.e., the child custody removal - rather than merely affirm it.  In the context of an emergency child custody removal, where ordinarily the hearing and order authorizing the removal will be issued after the removal has occurred, the removal – i.e., the relevant injury - is still caused by the state court judgment.  Had the Family Court found otherwise at the January 24, 2003 hearing, and not granted the removal order, Antonia would have had to have been returned to her parents.  Thus, the relevant injury did arise out of the state court judgment. Although the caseworkers acted prior to the issuance of the state court judgment, their actions were allowed and officially authorized only by that state court judgment. Conversely stated, without the authority provided by the state court judgment, the removal ultimately would not have been valid.

The Court rejects, however, the City Defendants' argument

-49-

that the relevant injury resulted from the Family Court's November 18, 2002 Order because ACS caseworkers removed Antonia based on their belief that Green had violated the November 18, 2002 Order.  Had the November 18, 2002 Order directed the ACS caseworkers to remove Antonia upon violation of its conditions – for example, had the Order stated that "failure to comply with these conditions will be grounds for city caseworkers to remove the children from the home" - it might be reasonable to argue that the November 18, 2002 Order compelled the caseworkers' actions.  However, a review of the November 18, 2002 Order reveals that it does not state anything of the sort.  Rather, the November 18, 2002 Order found that the children had been neglected, but ordered that Green receive an "adjournment in contemplation of dismissal" on the condition that she enforce the Order of Protection against Phillips, and also ordered her to cooperate with parenting classes and counseling provided by the Lower East Side Family Union.  It also ordered ACS to "make a progress report to the court ... on the implementation of th[e] order". (See November 18, 2002 Order, attached as Ex. D to Halbardier Aff., at FC 0136 to FC 0139.)

However, the November 18, 2002 Order does not direct ACS caseworkers to remove Antonia on the basis of perceived violations of that Order.  Thus, the underlying harmful action

complained of was not taken in compliance with or "under compulsion of" the November 18, 2002 Order. Hoblock, 422 F.3d at 89; see also Sindone, 439 F. Supp. at 273 & n.3. Unless the November 18, 2002 Order directed or compelled the caseworkers' actions, or set forth conditions under which they were authorized to act, that Order cannot fairly be said to have caused the relevant injury here. Otherwise, any defendant could engage in a wrong and then point to a state court judgment allegedly authorizing his or her actions, in which case the claim would be barred under Rooker-Feldman, regardless of whether the order actually permitted their actions.

Finally, Plaintiffs misguidedly argue that Exxon created "another exception" to Rooker-Feldman for "independent claims," and they assert such an independent claim "for money damages stemming from procedural and substantive constitutional violations resulting in the permanent disruption of the parent child relationship." (Pl. Mem. at 13). It is true that, as explained by Hoblock and Exxon, Rooker-Feldman does not deprive a federal district court of jurisdiction if a federal plaintiff "'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party.'" Hoblock, 422 F.3d at 86 (quoting Exxon, 544 U.S. at

293).  However, no such "independent claim" is presented here. The meaning of "independent" in this context is that the relevant injury is not caused by the state court judgment but, rather, is independent of it – such as in the employment discrimination example set forth above.  See also Hoblock, 422 F.3d at 87 ("Are the voters' federal constitutional claims independent of the state-court judgment, or does the voters' federal suit assert injury based on a state judgment and seek review and reversal of that judgment...?") (emphasis added). A federal suit does not raise an independent claim merely by raising a theory not passed upon by the state court.  Id.  The key inquiry is the relevant injury.  Even if the legal theory put forth in a federal suit differs from those raised in state court, Rooker-Feldman still bars that federal suit if the federal suit nonetheless complains of injury produced by a state-court judgment.  Id. ("Just presenting in federal court a legal theory not raised in state court, however, cannot insulate a federal plaintiff's suit from Rooker-Feldman if the federal suit nonetheless complains of injury from a state-court judgment and seeks to have that state-court judgment reversed."); Sindone, 439 F. Supp. 2d at 272.

Because the Court finds that Plaintiffs' due process claims concerning Antonia's removal complain of injuries caused by a state court judgment, the Court concludes that

-52-

under <u>Rooker-Feldman</u> it lacks jurisdiction to hear those claims.  Accordingly, Count One is dismissed in its entirety, and Count Three is dismissed to the extent that it relates to Antonia's removal from her parents' custody.[24]

B.   <u>QUALIFIED IMMUNITY AND CLAIMS AGAINST KINSEY, RIVERA, AND VORHEES</u>

The City Defendants argue that all claims against Kinsey, Rivera, and Vorhees must be dismissed because each of these defendants is entitled to qualified federal immunity, as well as immunity under state law.

The undisputed facts indicate that Kinsey's, Rivera's, and Vorhees's roles in the events at issue were limited to Antonia's removal from Green's custody and that these three defendants had no role in any of the events that transpired after Antonia was admitted to the Children's Center on the evening of January 22, 2003.  (<u>See</u> City Def. Rule 56.1 Statement ¶ 21.)  Thus, the Court's finding that <u>Rooker-Feldman</u> bars claims arising from Antonia's removal leads to the conclusion that all claims against Kinsey, Rivera, and Voorhees insofar as asserted in Counts One and Three must be dismissed.  The Court therefore does not address the issue of qualified immunity as it relates to these defendants.

---

[24] In light of this conclusion, the Court does not address the City Defendants' request to amend their answer to assert the affirmative defense of preclusion in order to argue that the propriety of the initial removal was necessarily litigated and decided.

C.   LIABILITY FOR INJURY TO ANTONIA AT ACS FACILITY UNDER
     COUNT TWO

Count Two of the Complaint asserts a cause of action for

"negligent placement and supervision."   Most of the

allegations in that Count assert that the defendants placed

Antonia in an inadequate foster home.[25]   However, Count Two

apparently has been narrowed, as Plaintiffs now contend, after

discovery, that Antonia was injured at the ACS pre-placement

facility and not while in custody of the foster care parents.

Thus, Plaintiffs no longer assert a theory of negligent

placement.   Instead, as to the Foster Agency Defendants,

Plaintiffs assert a negligent supervision theory based on the

conversation between Seda and Cartagena, and as to the City

Defendants, Plaintiffs assert a negligent supervision theory

based on an assault that allegedly occurred while Antonia was

at the Pre-Placement facility.   Under Federal Rule of Civil

---

[25] See, e.g., Compl. ¶ 133 (alleging that "it was the duty of the
defendants to properly and adequately place and situate the infant
plaintiff in a safe, suitable, adequate and appropriate foster home"); id.
¶ 134 (alleging that "it was the duty of the defendants to properly and
adequately place, supervise, care for, and situate the infant plaintiff in
a safe, suitable, adequate and appropriate kinship foster home"); id. ¶
135 (alleging that "defendants failed, neglected, omitted and refused to
properly and adequately place, supervise, care for and situate the infant
plaintiff in a safe, suitable, adequate and appropriate kinship foster
home"); id. ¶ 136 (alleging that "defendants intentionally, wantonly,
maliciously and improperly failed, neglected, omitted and refused to
properly and adequately place, supervise, care for and situate the infant
plaintiff in a safe, suitable, adequate and appropriate kinship foster
home"); id. ¶ 137 (alleging that the defendants "carelessly, negligently,
wantonly and illegally placed, supervised, cared for and/or caused,
allowed, directed and permitted the infant plaintiff ... to be placed in
the foster care and custody of the defendants Cartagena Cielo [sic] and
Jesus Gonzalez").

Procedure 8, inconsistent theories are allowed as long as they are included in the complaint.  See Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999) ("Rule 8(e)(2) ... permits plaintiffs to plead two or more statements of a claim, even within the same count, regardless of consistency.") (quotation omitted).  Such theories must be in the complaint in order to "give[] fair notice of what the plaintiff's claim is and the grounds upon which it rests." Phelps v. Kapnolas, 308 F.3d 180, 186 (2d Cir. 2002) (internal quotations omitted).

The Complaint just barely contains enough allegations to sustain a theory of injury at the ACS pre-placement facility, even by notice pleading standards.  One paragraph in Count Two asserts that the defendants assaulted Antonia, without pinpointing a time frame.  See Compl. ¶ 139 ("[A]t all times herein mentioned, and at such times as the infant plaintiff was taken into and placed within the care, custody and/or foster care of the defendants, the infant plaintiff was assaulted, attacked, beaten, violently shaken, struck, molested, seriously and near fatally injured by the defendants, and/or said servants, agents, case workers, counselors, foster parents, representatives and/or employees.").  In addition, although the Complaint alleges that at the time Antonia was dropped off at the foster home, the foster mother observed that Antonia was "behaving like a

normal baby," it also states that at the same time, the foster mother noted that Antonia had "occasional crying and some vomiting of her milk."  (Id. ¶ 37.)  Taken together, these allegations can be read, if read generously, to express a claim that Antonia was injured while at the ACS pre-placement facility.  The Court reads the Complaint to encompass this theory in order to comply with Rule 8(f)'s requirement that all pleadings be "so construed as to do substantial justice." Fed. R. Civ. P. 8(f).  To read the complaint otherwise would place too much burden on Plaintiffs prior to discovery to pinpoint where in the City's custody Antonia was located when she was allegedly injured.

In response to Defendants' "contention interrogatories," Plaintiffs further explained this theory of injury at the ACS pre-placement facility, and explained that it supported not only negligence claims, but also constitutional claims:  the City Defendants allegedly violated Plaintiffs' rights under the First, Fifth, and Fourteenth Amendments because Antonia was injured while in ACS custody either by one of the defendants or by another child in the facility, and because she was denied adequate medical care while present there. Specifically, the interrogatory answers assert that:

> Defendant City of New York recklessly permitted its
> caseworkers and supervisors to act in egregious disregard
> of its own rules and regulations and in so doing
> recklessly violated the constitutional rights of each

plaintiff herein.  Further, Defendant, the City of New
York recklessly failed to obtain competent medical care
for the infant plaintiff when she was obviously in
distress at Defendant's facility and recklessly failed to
ensure the infant plaintiff obtained competent medical
assistance.  Instead, Defendant ACS sent the infant out
of its facility, injured, ill, vomiting, and with a half
bottle of Pedialyte.  Further, Defendant ACS
intentionally falsely represented that the infant
plaintiff despite her severe condition had no medical
needs and had already been seen by a physician at the ACS
facility.  Defendant ACS also recklessly failed to ensure
the safety of the infant in its facility thereby
resulting in the infant plaintiff being viciously
attacked and assaulted causing severe brain injuries,
injuries to the extremities and permanent and severe
disabilities.  All of which amounted to severe
malfeasance and reckless misconduct in the screening and
training of each of its employees and/or supervision of
other children roaming the facility including older
children and those on psychotropic medication.

(Plaintiffs' Response to Defendant The City of New York's

First Set of Contention Interrogatories, attached as Ex. J to

Feinberg Decl., ¶ 3(b)); see also id. ¶ 8(b) (asserting

violations of First, Fifth, and Fourteenth Amendments).[26]

     The Fifth Amendment is limited to actions of the federal

government, and is thus inapplicable to a claim against the

City of New York without some evidence of "federal action."

See Taylor v. Evans, 72 F. Supp. 2d 298, 305 n.3 (S.D.N.Y.

1999).  It is also unclear on what basis Plaintiffs assert a

First Amendment claim.  Accordingly, the City Defendants have

addressed the claims as being asserted solely under the

_____

[26] The contention interrogatories are also attached to the City Defendants'
papers, but are missing several pages.  Accordingly, the Court quotes from
the copy provided by the Foster Agency Defendants in support of the latter
defendants' motion.

Fourteenth Amendment.

Count Two does not clearly assert a constitutional cause of action, although the introductory paragraphs to the complaint assert violations of the First, Fifth, and Fourteenth Amendments (see Compl. ¶¶ 5-6.) and Count Four asserts constitutional claims against the City of New York and CHB.   This raises the issue of whether Plaintiffs are attempting to amend their complaint through assertions made in answers to interrogatories and in subsequent briefing memoranda.   In any event, the Court finds that aside from claims against the City of New York, Plaintiffs have not met the standard to survive summary judgment for any constitutional claims asserted against other City Defendants.

Plaintiffs have put forth no evidence whatsoever indicating that any of the City employees that are named as defendants assaulted Antonia.   While not disavowing this theory, Plaintiffs' opposition papers focus on risks from understaffing and from other children at the facility, and potentially other City employees not named as defendants.[27] For example, Plaintiffs state that "it is plaintiffs' position that there is no separate facility for children on psychotropic medication and that children who are receiving

---

[27] Plaintiffs appear to be preserving the theory that some City employee assaulted Antonia, when they state that they have "never limited the vicious conduct to Defendants' employees." (Pl. Mem. at 28 (emphasis added).)

-58-

psychotropic medication are placed with the remainder of the pre-placement population. ...   It is further plaintiffs' position that it is not the children who are receiving psychotropic medication who are the danger, but rather those who are not receiving such medication and should have been." (Pl. Rule 56.1 Statement ¶ 40.)  Therefore, liability on the part of any named City Defendant stemming from the assault must be based on failure to protect, failure to supervise, or failure to provide adequate medical treatment.

Section 1983 of the Civil Rights Act ("§ 1983") creates a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  As this Court noted in Tylena M. v. Heartshare Children's Services, "'children in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm.'"  390 F. Supp. 2d 296, 302 (S.D.N.Y. 2005) (quoting Marisol A. v. Giuliani, 929 F. Supp. 662, 675 (S.D.N.Y. 1996)).  This right to be free from harm "includes the right to essentials of care such as adequate food, shelter, clothing, and medical attention." Richards v. City of New York, No. 97 Civ. 7990, 2006 WL

-59-

166341, at *15 (S.D.N.Y. June 15, 2006).

Section 1983 creates liability for omissions as well as affirmative acts:  "When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." <u>Doe v. New York City Dep't of Soc. Servs.</u>, 649 F.2d 134, 141 (2d Cir. 1981); <u>Tylena</u>, 390 F. Supp. 2d at 302.  Liability for nonfeasance of such affirmative duties by a governmental custodian requires that (1) the omissions were a "substantial factor" leading to the denial of a constitutionally protected liberty or property interest, and (2) the officials in charge[28] of the agency being sued must have displayed a mental state of "deliberate indifference."  <u>Doe</u>, 649 F.2d at 141 (<u>quoting Turpin v. Mailet</u>, 579 F.2d 152, 166 (2d Cir. 1978)); <u>Richards</u>, 2006 WL 166341, at *16; <u>Tylena</u>, 390 F. Supp. 2d at 302.[29]

Here, Plaintiffs face a problem.  Putting aside claims

---

[28] Where an employee of the agency is also being sued in his or her individual capacity, that employee must also exhibit deliberate indifference for the employee to be liable.  See <u>Hernandez v. Keane</u>, 341 F.3d 137, 144 (2d Cir. 2003) ("Defendants were sued in their individual capacities; the liability of each therefore depends on a showing that he or she acted with deliberate indifference."); <u>Doe</u>, 649 F.2d at 145 ("Defendants may be held liable under § 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference ....").

[29] In addition, to the extent that Plaintiffs' claims are asserted against the City or against individual defendants in their official capacity, they require proof that the City's policy or custom played a part in the violation.  See <u>Tylena</u>, 390 F. Supp. 2d at 303; <u>Brogdon v. City of New Rochelle</u>, 200 F. Supp. 2d 411, 418 n.3 (S.D.N.Y. 2002).

against the City itself, which will be dealt with separately in the section below on municipal liability, on the basis of the evidentiary record before the Court on this motion, none of the individual named defendants associated with ACS meet this rigorous standard.

Aside from the City itself, the named City Defendants consist of Kinsey, Rivera, Vorhees, and Webb-Alexander. Plaintiffs also name certain "John Doe" and "Jane Doe" social workers, as well as a "John" Newmark, but have never amended their complaint to identify any of the anonymous defendants. The Court will address each of these defendants in turn.

### 1. Kinsey, Rivera, and Vorhees

As explained above, the undisputed facts show that the roles of Kinsey, Rivera, and Vorhees in connection with the events Plaintiffs allege resulted in Antonia's injuries were limited to the initial removal of Antonia from Green and placing her at ACS -- prior when Plaintiffs allege that Antonia was assaulted. None of these three defendants had any role in what happened to Antonia at the ACS facility. Thus, these three defendants cannot be liable on Count Two for the assault on Antonia.

### 2. Webb-Alexander

Plaintiffs assert that Webb-Alexander "falsely represented" to Cartagena that Antonia had no medical needs

-61-

and had already been seen by a physician.  (Pl. Mem. at 22.)
To sustain a claim for failure to provide an individual in
custody with proper medical care, a plaintiff must prove
"deliberate indifference to serious medical needs." Richards,
2006 WL 1663341, at *15; see Estelle v. Gamble, 429 U.S. 97,
104 (1976); Daniel H. v. City of New York, 115 F. Supp. 2d
423, 430 (S.D.N.Y. 2000).[30]   "An official acts with the
requisite deliberate indifference when that official 'knows of
and disregards an excessive risk to [the person in custody's]
health or safety.'" Chance v. Armstrong, 143 F.3d 698, 702
(2d Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 837
(1994)).

Plaintiffs have not raised a triable issue of fact that
Webb-Alexander knew of and disregarded a risk to Antonia's
health and safety.  Webb-Alexander's role in these events was
limited to transporting Antonia from the ACS facility to the
foster home after Antonia had been medically cleared for
placement.  During that time, nothing in the record points to
facts that arose or occurred suggesting that Webb-Alexander
became aware that Antonia's health was at risk and that she
disregarded this risk.   To the contrary, the evidence

---

[30] This standard was enunciated in Estelle, in the context of when a
prisoner's inadequate medical care gave rise to an Eighth Amendment claim.
However, subsequent cases have applied this standard to a due process
analysis of other persons in state custody.  See Richards, 2006 WL
1663341, at *15 (applying standard to claim for inadequate mental health
treatment for children in foster care); Daniel H., 115 F. Supp. 2d at 430.

indicates that Webb-Alexander sat next to Antonia during the
ride to Cartagena's home, that there were no accidents or
bumps during that ride, and that Antonia remained in her car
seat the entire time.  In response to Antonia's crying, Webb-
Alexander reached into the duffle bag and fed Antonia some
milk, after which Antonia neither cried nor vomited.

Although Plaintiffs dispute the "veracity" of the
allegation that Antonia did not cry or vomit after being fed
in the van, they cite to no contradictory statement by Webb-
Alexander or witness, or to any other evidence to support such
a dispute.  "In order to defeat a [properly supported] summary
judgment motion ..., the opposing party is required to come
forward with materials envisioned by the Rule, setting forth
specific facts showing that there is a genuine issue of
material fact to be tried.  He cannot defeat the motion by ...
mere assertions that affidavits supporting the motion are not
credible." Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d
Cir. 1996) (citations omitted).  Thus, the only incident of
note during that van ride was that Antonia cried briefly, and
stopped after being fed.  That an eight-month old baby cried
or even vomited does not by itself raise a triable issue of
fact as to whether Webb-Alexander knew that Antonia had
serious medical needs at that time and acted with deliberate
indifference to them.

Plaintiffs also attempt to raise a disputed issue of fact by stating that Webb-Alexander denied seeing vomit on Antonia's clothing in the duffel bag even though she opened the bag to get the formula, and that, according to Cartagena, the baby vomited in front of Webb-Alexander.   In contrast, Webb-Alexander states only that she noticed milk on Antonia's chin from the feeding in the van.   Accepting Plaintiffs' evidence as true, even if the bag contained clothing with vomit, even if Webb-Alexander had seen these clothes, and even if Antonia had vomited in front of Webb-Alexander at Cartagena's home, Webb-Alexander's actions do not rise to the level of deliberate indifference to Antonia's serious medical needs.   A rational jury could not conclude based on one incident of Antonia's vomiting when she was already in the presence of the foster mother, and vomit on the clothing in Antonia's bag – which the evidence indicates was not packed by Webb-Alexander – after Antonia had been medically cleared for placement, that Webb-Alexander, the transportation worker, "knew or should have know that Antonia Phillips was in need of medical evaluation and instead of ensuring that she received it, concealed her condition from the foster parents who could have intervened in a timely fashion."  (Pl. Mem. at 23.)

Nor have Plaintiffs created a genuine issue of material fact by disputing the "veracity" of Webb-Alexander's testimony

that while in the apartment she observed Antonia's face and observed no marks or bruises, and that Antonia was smiling and appeared to be happy.   Plaintiffs point to Cartagena's testimony that she observed red marks – which Plaintiffs contend were petechiae - around the infant's eyes when she was dropped off.  Since Cartagena testified that she noticed these marks when she took off Antonia's hat after Webb-Alexander left, presumably Plaintiffs are suggesting that these marks existed prior to Antonia being dropped off, and thus that Webb-Alexander noticed them and deliberately concealed them rather than calling them to Cartagena's attention.  That Webb-Alexander, whose role was to deliver a medically cleared child for placement, may have noticed these marks simply fails to rise to the level of deliberate indifference to serious medical needs necessary to sustain a § 1983 claim against Webb-Alexander.

Even if Webb-Alexander's actions could be construed as negligent in failing to disclose to Cartagena Antonia's vomiting or red marks around her eyes, ordinary negligence is not sufficient by itself to establish liability under § 1983. See Doe, 649 F.2d at 143; see also Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996) ("[A] claim that a state actor acted negligently does not state a deprivation of constitutional rights."); Tylena, 390 F. Supp. 2d at 306.

-65-

In the alternative, based on these facts, Webb-Alexander would certainly be entitled to qualified immunity, given her understanding that Antonia had been medically cleared, her limited interaction with Antonia and what she observed during that interaction.

3.   Unnamed Defendants

Plaintiffs have disputed the adequacy of the training provided to Dalrymple and other ACS childcare workers who worked with Antonia at the pre-placement facility on January 22-23, 2003.  As a preliminary matter, the Court observes that although Plaintiffs dispute the adequacy of this training, Plaintiffs do not assert that any of these individuals committed a violation.  None of these City employees (such as Dalrymple, Maksumov, Charles, Boone, Porter, Nieves, Deans, Albano, Pitts, or Browning) are named defendants.  Although the Complaint asserts claims against "John Does" and "Jane Does," who are alleged to be ACS social workers, as well as against a "'John' Newmark," who is alleged to be a City caseworker, Plaintiffs have not asserted that these City employees are such John and Jane Does.

Nor could Plaintiffs amend their complaint at this time to identify these particular ACS employees as the John and Jane Doe defendants, as the statute of limitations for their claims has expired, and Plaintiffs do not meet the standard

under Rule 15 for amending the complaint to substitute named defendants for fictitious parties.  The statute of limitations applicable to claims brought under § 1983 in New York is three years, Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004), and begins to run "'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'"  Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir. 1997) (quoting Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980)).  Here, Plaintiffs knew of or had reason to know of Antonia's injury by the end of January 2003, when Antonia's injury was discovered; thus, the statute of limitations on these claims has expired.  Lack of knowledge of a defendant's identity, asserted through a John Doe pleading, cannot be used to circumvent the statute of limitations.  See Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (affirming dismissal of plaintiff's excessive force claims as time-barred because the officers named in the original complaint as "John Does" were not specified until two years after the statute of limitations had run); Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1075 (2d Cir. 1993) ("'John Doe' pleadings cannot be used to circumvent statues of limitations...."); Johnson v. Constantellis, No. 03 Civ. 1267, 2005 WL 2291195, at *23 (S.D.N.Y. Aug. 10, 2005) (lack of knowledge of defendant's identity does not constitute "mistake" for relation back purposes) (collecting cases).

-67-

Indeed, in response to the City Defendants' argument that Plaintiffs failed to sue a "person" as required under § 1983, Plaintiffs do not respond that they did indeed sue a person and that such person is any of the unnamed ACS employees. Rather, Plaintiffs assert that the relevant person is only the City itself.

Thus, as Plaintiffs have not raised a genuine issue of material fact in relation to Kinsey, Vorhees, Rivera, or Webb-Alexander, and no other named defendant had any role in what happened to Antonia at the ACS Children's Center, liability for any constitutional violations in connection with Antonia's stay at that facility can be placed solely upon the City itself.

Whether the City is liable for failure to protect Antonia from assault at the ACS facility, or for failure to provide appropriate medical care, is analyzed under the framework of Monell, as well as under state law. It is Count Four that asserts a claim for Monell and state law liability.  This claim is addressed in the next section.

D.   LIABILITY FOR INJURY TO ANTONIA AT ACS FACILITY UNDER
     COUNT FOUR

Count Four asserts claims of negligent hiring, training, and supervision against the City (as well as Catholic Home

Bureau) under 42 U.S.C. § 1983, <u>Monell</u>,[31] and state law.
Specifically, Plaintiffs assert that the City and/or ACS acted
with negligence and deliberate indifference in hiring,
training, and supervising its employees, and that these
omissions resulted in Antonia's injuries.

> 1.   <u>Whether the City Can Be Liable Absent a
>       Constitutional Violation by a Named Defendant</u>

The Court first must address an erroneous contention by
the City Defendants.  The City Defendants argue that because
Plaintiffs have failed to establish a constitutional violation
by any of the named individual City defendants, the City
itself cannot be liable.  According to the City Defendants,
absent a constitutional violation by a named defendant, there
can be no municipal liability under <u>Monell</u>.  In support of
this argument, the City Defendants cite <u>City of Los Angeles v.
Heller</u>, which held that a municipality could not be liable for
the actions of one of its officers when the jury concluded
that the officer inflicted no constitutional harm.  475 U.S.
796, 799 (1986).

However, the Second Circuit has, since <u>Heller</u>, expressly
held that "under <u>Monell</u> municipal liability for constitutional
injuries may be found to exist even in the absence of

---

[31]   Under <u>Monell</u>, a municipality can be liable for the unconstitutional
acts of its employees if those acts carry out a municipal policy or
practice.  <u>See</u> 436 U.S. at 690-91.

-69-

individual liability, at least so long as the injuries complained of <u>are</u> <u>not</u> <u>solely</u> <u>attributable</u> to the actions of named individual defendants." <u>Barrett v. Orange County Human Rights Comm'n</u>, 194 F.3d 341, 350 (2d Cir. 1999) (emphasis added); <u>see also</u> <u>Curley v. Village of Suffern</u>, 268 F.3d 65, 71 (2d Cir. 2001) ("<u>Heller</u> should not ... be applied indiscriminately. For example, where alleged injuries are not solely attributable to the actions of named individual defendants, municipal liability may still be found."). Thus, the absence of a constitutional violation by a named defendant does not mandate summary judgment for the City if the allegedly unconstitutional injuries Antonia, Green, and Phillip complain of were based in part on the actions of other persons under the City's employ or control but not named as defendants.

Here, Plaintiffs have alleged that Antonia was injured while at the ACS pre-placement facility (the City Defendants do not dispute this timing for summary judgment purposes), and that those involved in Antonia's care -- including those not named as defendants -- collectively failed to supervise, protect, or provide adequate medical treatment, causing Antonia's injuries. Thus, the injuries Plaintiffs complain of are not solely attributable to the named individual defendants, but instead arise from all those involved in

Antonia's care while she was at the ACS facility.  As a result, Plaintiffs' <u>Monell</u> claim against the City cannot be dismissed on this basis.

> 2.  <u>Whether the Constitutional Violations Were a Result of an Official Policy or Custom</u>

Under <u>Monell</u>, the City cannot be liable under § 1983 for the constitutional violations of its employees unless the allegedly unconstitutional action "implements or executes a policy statement, ordinance, or regulation, or decision officially adopted and promulgated by the [City]'s officers," or, even without formal governmental approval, is "visited pursuant to governmental custom."  436 U.S. at 690-91.  Thus, Plaintiffs must show that the City's "'policy or custom played a part'" in the alleged violation of federal law.  <u>Tylena</u>, 390 F. Supp. 2d at 303 (<u>quoting</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991)); <u>see</u> <u>Neighbour v. Covert</u>, 68 F.3d 1508, 1511-12 (2d Cir. 1995).

Plaintiffs assert that the City inadequately trained its employees, and that the ACS facilities were inadequately supervised.  With regard to inadequate supervision, Plaintiffs focus on a policy or custom of understaffing.  Plaintiffs also assert a negligent hiring theory.  Plaintiffs allege that Antonia was injured as a direct result of this inadequate training, supervision, and hiring.

Although what Plaintiffs must show to survive summary

judgment varies based on whether they are asserting a theory of inadequate training, inadequate supervision, or inadequate hiring, the common thread running through each of these theories is that the defendant must exhibit a mental state of "deliberate indifference" to a known injury, risk, or duty, and that the failure to perform such duty or to ameliorate such risk proximately caused the constitutional violation. See Doe, 649 F.2d at 145 ("Defendants may be held liable under § 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of the plaintiff's deprivation of rights under the Constitution."). A policymaker's indifference is deliberate when the policymaker "makes a 'deliberate choice ... from among various alternatives.'" Walker v City of New York, 974 F.2d 293, 297 (2d Cir. 1992) (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)); see Richards, 2006 WL 1663341, at *17, Tylena, 390 F. Supp. 2d at 307. Deliberate indifference need not relate to a known injury, but instead can relate to a "known risk" or a "specific duty." See Doe, 649 F.2d at 145; Richards, 2006 WL 1663341, at *17; Tylena, 390 F. Supp. 2d at 307. Ordinary negligence does not by itself constitute deliberate

indifference, but repeated acts of negligence can be evidence
of indifference.  See Doe, 649 F.2d at 142-43; Richards, 2006
WL 1663341, at *17; Tylena, 390 F. Supp. 2d at 306.  "The
means of establishing deliberate indifference will vary given
the facts of the case."  Amnesty America, 361 F.3d at 128.
"The operative inquiry is whether the facts suggest that the
policymaker's inaction was the result of a 'conscious choice'
rather than mere negligence."  Id. (quoting City of Canton,
489 U.S. at 389).

> a.  *Inadequate Training*

The failure to provide proper training may be fairly said
to represent a City policy when "the need for more or
different training is so obvious, and the inadequacy so likely
to result in the violation of constitutional rights, that the
policymakers of the city can reasonably be said to have been
deliberately indifferent to the need."  City of Canton, 489
U.S. at 390.  In addition, the deficiency in training must
have actually caused the injury.  Id.; Amnesty America, 361
F.3d at 129; Brogdon, 200 F. Supp. 2d at 427 ("The first
question to be answered in any case alleging municipal
liability is whether there is a direct causal link between
some municipal policy or custom, and the alleged
constitutional deprivation.").  Plaintiffs must put forth
evidence as to "how the training was conducted, how better or

different training could have prevented the challenged
conduct, or how 'a hypothetically well-trained [employee]
could have acted under the circumstances.'" <u>Amnesty America</u>,
361 F.3d at 130 (<u>quoting</u> <u>City of Canton</u>, 489 U.S. at 391); <u>see</u>
<u>Richards</u>, 2006 WL 1663341, at *21.   "[T]he focus must be on
adequacy of the training program in relation to the tasks the
particular [employees] must perform.   That a particular
[employee] may be unsatisfactorily trained will not alone
suffice to fasten liability on the city, for the [employee]'s
shortcomings may have resulted from factors other than a
faulty training program." <u>City of Canton</u>, 489 U.S. at 390-91.
In sum, "[i]n the failure to train context, ... plaintiffs
must establish that the officials consciously disregarded a
<u>risk</u> of future violations of clearly established
constitutional rights by badly trained employees." <u>Amnesty
America</u>, 361 F.3d at 127 n.8 (<u>citing</u> <u>City of Canton</u>, 489 U.S.
at 389-90) (emphasis in original).

Here, Plaintiffs have not raised a triable issue of fact
that the ACS workers were inadequately trained, that such lack
of training caused Antonia's injuries, and that the City acted
with deliberate indifference in disregarding a risk posed by
the lack of any such training.

The City Defendants have put forth evidence that the ACS
workers involved in Antonia's care were required to undergo

training during their employment, including training on signs of child abuse and shaken baby syndrome.  Although Plaintiffs dispute that the Children's Counselors assigned to Antonia on January 22-23, 2003 had any such training, they do not point to any evidence suggesting otherwise.  Similarly, although Plaintiffs dispute that Dalrymple received training for her job duties, as discussed earlier, the deposition testimony to which they point indicates that in fact Dalrymple did receive training.  Plaintiffs also dispute the adequacy of the training because it was provided on the job rather than prior to employment, and occurred in one-and-one-half to two hour sessions four times a year.  Yet Plaintiffs fail to present evidence establishing that these training sessions, either by reason of their duration or that they occurred on-the-job, were insufficient.  See Richards, 2006 WL 1663341, at *22 ("[A]ll plaintiffs allege is that a single caseworker was not trained as a social worker before taking on the [child's] case but was trained while on the job.  This alone does not support a claim under § 1983 based upon inadequacy of training.").  Further, it is undisputed that Maksumov and Charles, who were assigned to Antonia during her first night at ACS, were trained to bring a child experiencing any complications, vomiting, or other suspicious behaviors to the nurse.

Although Plaintiffs dispute the City Defendants' evidence

that other childcare workers and their supervisors were
trained to notify the nurse on duty of illnesses or problems
with a child, to prepare accident reports if any child is
injured during a shift, and to report unusual incidents to
their supervisor, Plaintiffs' asserted dispute rests solely on
the purported lack of personal knowledge of the affiant, Maye.
The Court has already determined that a rational factfinder
could not reasonably infer that Maye had insufficient personal
knowledge of the circumstances to which he attested, and thus
considered his affidavit in evaluating the instant motion.
Moreover, the evidence establishes that Antonia was seen by
ACS nurses on January 22, 2003 at 10:28 p.m., January 23, 2003
at approximately 12:30 p.m., and again on January 23, 2003 at
4:00 p.m., and Plaintiffs have not raised any material factual
issues disputing nurses' training.  Thus, Plaintiffs have not
raised a triable issue of fact as to how any deficiencies in
ACS staff training proximately caused Antonia's injury or how
better training would have prevented the injury.

Plaintiffs note that at one point during Antonia's stay
at ACS, Albano took Antonia's temperature and allegedly
determined that Antonia was healthy, but did not document her
findings.  Although this failure to record the temperature may
call into question the accuracy of Albano's subsequent memory
of Antonia's temperature, there is no evidence that the

failure to do so by itself was a result of inadequate training, or that this failure resulted in Antonia's injuries.

Nor have Plaintiffs raised a genuine issue of material fact as to whether the City was deliberately indifferent to the need for more training.  There is nothing in the record to suggest that the need for more or better training was obvious, and that in the face of such evidence the City chose not to provide such training.  For example, if the City had received reports of "shaken baby" incidents or other injuries, and did nothing in the face of such reports, such inaction may have evidenced deliberate indifference to the constitutional rights of the children in its care.  However, as the City Defendants point out, Children's Center workers are trained to report such incidents, there has never been a report of a "shaken baby" or a serious injury to a child at the Children's Center, and its Director Maye was not aware of any non-accidental or serious injury at the facility during his tenure.  The City Defendants have met their burden of demonstrating the absence of any genuine issue of material fact as to whether the City was deliberately indifferent to the need for more training.  Plaintiffs have not put forth evidence controverting these facts.

Plaintiffs parse Maye's affidavit to contend that although City workers are trained to report unusual incidents

or accidents to their supervisors, there is no indication of whether such reports are required or that childcare workers actually report any unusual incidents to their supervisors as a matter of custom.  Plaintiffs stretch and strain Maye's words instead of setting forth specific facts demonstrating a genuine issue for trial.  This is not "significant probative evidence tending to support" the existence of a disputed fact.  Anderson, 477 U.S. at 249.  "When the movant comes forward with facts showing that his adversary's case is baseless, the opponent cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts."  Beal v. Lindsay, 468 F.2d 287, 291 (2d Cir. 1972).  In the face of the City Defendants' evidence that such training occurs and that no reports were received, Plaintiffs have failed to adduce factual material raising a substantial question as to the veracity or completeness of the City Defendants' showing as to the lack of deliberate indifference.  The inference Plaintiffs suggest -- that injuries and accidents involving children in ACS care occur but are not reported because child care workers, although trained to report such incidents, are not required to do so -- is not supported by any evidence to which Plaintiffs have pointed in the record but would be based

purely on Plaintiffs' conclusory or speculative contentions. To that extent, it cannot be considered a reasonable inference a rational factfinder would draw from this dispute.

b.  _Inadequate Supervision_

Perhaps recognizing the weaknesses in their arguments relating to the City's training procedures, Plaintiffs in their opposition brief do not even truly attempt to argue that the ACS employees were not properly trained, but instead assert for the first time, and focus primarily on, the contention that the City had a policy and practice of "understaffing" the ACS facility.  A policy and practice of understaffing the Children's Center was not asserted in the Complaint, nor was it described in Plaintiffs' responses to the City Defendants' contention interrogatories.  Although the appearance  of this argument for the first time in Plaintiffs' opposition brief gives the Court some concern that Plaintiffs are attempting to amend their pleadings through subsequent briefs, reading the Complaint in the light most favorable to Plaintiffs and drawing reasonable inferences in their favor, "understaffing" could be conceptualized as a form of inadequate supervision of, and thus creation of undue risk of harm to, the children at the ACS facility.  On this basis, the Court concludes that Plaintiffs' allegation of understaffing at the Children's Center is encompassed by the Complaint's

-79-

claims of inadequate supervision.

To sustain a claim of a municipality's failure to supervise children in its care, Plaintiffs must demonstrate that the City Defendants' acts or omissions were a substantial factor leading to the denial of a constitutionally protected liberty interest, and that the defendants displayed a mental state of deliberate indifference. See Tylena, 390 F. Supp. 2d at 303 n.3.[32] Plaintiffs must show that "the need for more or better supervision to protect against constitutional violations was obvious," and thus that policymakers officials deliberately ignored an obvious need for supervision. Amnesty America, 361 F.3d at 127 n.8; Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). The operative inquiry is whether the facts suggest that the policymaker's inaction was a result of "conscious choice" rather than mere negligence. Amnesty America, 361 F.3d at 128 (citing City of Canton, 489

---

[32] The standard test for liability for failure to supervise municipal employees is that (1) the defendants know to a moral certainty that employees will confront a given situation; (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a constitutional right. See Walker, 974 F.2d at 297-98. Here, Plaintiffs do not seem to assert that the City failed to supervise its employees, but that its employees failed to supervise Antonia and other children in ACS care, resulting in Antonia's injuries. Under such circumstances, where the failure to supervise claims relate to supervision of the children in foster care placement, rather than supervision of employees, this Court has employed Doe's test for liability for failure to supervise: (1) the defendants' acts or omissions were a substantial factor leading to the denial of a constitutionally protected liberty interest, and (2) the defendants displayed a mental state of deliberate indifference. See Tylena, 390 F. Supp. 2d at 303 n.3.

U.S. at 389); see Richards, 2006 WL 1663341, at *17.

The Court finds that Plaintiffs have raised a triable issue of fact as to whether the City had a custom of understaffing its ACS facility, and whether such custom led to Antonia's injuries.  Plaintiffs have set forth evidence suggesting that the ACS facility may have been frequently staffed by two workers when three were needed, and that supervisors were aware of this situation.  Dalrymple testified that there should be a ratio of one staff member to three children, and thus if there were nine children at the ACS Center, there should have been three staff members.  Although Dalrymple described only the 4 p.m. to midnight shift this way, Charles, who worked the midnight to 8 a.m. shift on January 23, 2003, also indicated that it was a "busy" night because only two childcare workers were assigned to nine children.  Moreover, Charles' testimony also suggests that staffing the facility with two rather than three workers may have been common, and that the supervisors were aware of this: she stated that her "supervisor will know ... if we are understaffed.  If we are under, it's mostly two.  We can't help it;" and when asked if only two workers would be assigned when the facility was understaffed, stated, "Yes, they understaffed, but usually we have – we have the babies, we have the toddlers and we also have the little ones.  Mostly

there is two staff there."  (Charles Dep. at 9-10 (emphasis added).)  Charles also testified that the midnight to 8 a.m. shift would get two to three staff members, depending on the number of children; and that if more than five children were present, there would be three staff members, especially if the children included babies.  (Id. at 6-8.)  Drawing all inferences in favor of the Plaintiffs, the Court finds that this evidence raises a triable issue of fact that the ACS facility may have been understaffed during Antonia's stay there and that the supervisors were aware that this staffing condition existed, thus setting forth a dispute for trial as to whether the City acted with deliberate indifference in not staffing the facility with more workers.

If the facility was understaffed, the ACS workers may not have been able to adequately supervise the children or attend to any injuries.  It is thus conceivable that someone (although Plaintiffs have not identified who) was able to injure Antonia without any ACS worker noticing, and that because the facility was understaffed, after such injury occurred, ACS workers were unable to provide Antonia with appropriate medical care.[33]  At least some evidence supports

---

[33] The source of the injury has been somewhat of a moving target in these proceedings.  While the Complaint suggests that one of the defendants assaulted Antonia, the contention interrogatories state that Antonia faced a risk at the ACS facility from "other children roaming the facility including older children and those on psychotropic medication."  (See City Def. Mem. at 2.)  In response to the City Defendants' observation that no

Plaintiffs' contention that understaffing led to inadequate supervision:  Charles indicated that she had made a mistake the night Antonia stayed at the facility, by writing down Antonia's name instead of another child as the child who had gone to the hospital, and that this mistake may have been made because she was so busy.  Similarly, the parties dispute whether Boone was left alone with six children, including Antonia, for 15 minutes or close to two hours.  Thus, Plaintiffs have raised a triable issue of fact as to whether a custom of understaffing was a causal factor in Antonia's injuries.

   c.  _Inadequate Hiring_

   Although the Complaint asserts a negligent hiring claim, the Plaintiffs have presented no evidence to support this claim.  "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's

---

children on psychotropic medication were at the facility during Antonia's stay there, Plaintiffs state that "it is not the children who are receiving psychotropic medication who are the danger, but rather those who are not receiving such medication and should have been." (Pl. Rule 56.1 Response (City) ¶ 40.)  Yet Plaintiffs point to no evidence of any such children not receiving medicine who should have been.  Nonetheless, that Plaintiffs have not yet ferreted out who injured Antonia does not relieve the City from liability if through deliberate understaffing it created the conditions that may have led to the assailants' ability to injure Antonia or to another child's ability to interact with Antonia unsupervised in a way that led to Antonia's injuries.

federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" Board of County Comm'rs v. Brown, 520 U.S. 397, 411 (1997). Here, each ACS worker who worked directly with the children prepared an employment application and submitted to a criminal background check and, and all ACS employees were cleared through the State Central Register. On the record before the Court, there is no evidence of circumstances in the backgrounds of the workers who staffed the ACS facility during Antonia's stay there that the City failed to properly scrutinize, that plainly led to Antonia's injuries, and that the decision to ignore would constitute deliberate indifference. Although Plaintiffs dispute the sufficiency of the ACS workers' background checks because such checks were limited to only "official" reports and convictions, Plaintiffs have not presented any evidence that these checks were insufficient as a general matter or in this context, or any evidence of unofficial accusations that would not be covered by the background checks. Thus, the Court concludes that Plaintiffs have not raised any material issue of fact on the basis of which the City may be liable for constitutional violations on a theory of inadequate hiring.

    3.   State Law Claims

        Plaintiffs have also asserted state law claims of

-84-

negligent hiring, training, and supervision.

Jurisdiction over pendent state law claims is generally a matter for the exercise of the court's discretion. See Tops Mkt., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 103 (2d Cir. 1998). In considering whether to exercise pendent jurisdiction, a federal court should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); Tops Market, 142 F.3d at 103. When all federal claims have been eliminated, the Cohill factors generally point toward dismissal of state law claims, although this is not a mandatory rule. See Cohill, 484 U.S. at 350 n.7. Here, federal claims under § 1983 and Monell against the City for inadequate supervision survive summary judgment, and the state law claims arise out of the same nucleus of operative facts. See id. at 350-51. Accordingly, this Court chooses to exercise its jurisdiction over the remaining state law claims.

As indicated above, there is no evidence of negligent hiring or training. However, Plaintiffs have raised a triable issue of fact as to negligent supervision of Antonia.

To prevail on a negligence claim under New York law, a

-85-

plaintiff must establish "that the defendant: (1) owed a duty of care; (2) breached that duty; and (3) that the breach was the proximate cause of the plaintiff's injuries." <u>Vega v. Fox</u>, No. 05 Civ. 2286, 2006 WL 397941, at *5 (S.D.N.Y. Feb. 21, 2006); <u>see</u> <u>Alfaro v. Wal-Mart Stores, Inc.</u>, 210 F.3d 111, 114 (2d Cir. 2000); <u>Tylena</u>, 390 F. Supp. 2d at 317; <u>La Fountain v. County of Clinton</u>, 654 N.Y.S.2d 870, 870-71 (App. Div. 3rd Dep't 1997) (<u>citing</u> <u>Akins v. Glens Falls City Sch. Dist.</u>, 424 N.E.2d 531 (N.Y. 1981)).

There is no serious dispute that the City owed Antonia a duty of adequate supervision.  "[L]iability may be imposed upon a state or its subdivisions for injuries sustained by children due to negligent oversight of the foster homes that care for them." <u>Sean M. v. City of New York</u>, 795 N.Y.S.2d 539, 548 (App. Div. 1st Dep't 2005); <u>see</u> <u>Tylena</u>, 390 F. Supp. 2d at 313-14.

"[I]n order to find that a school or foster care facility has breached its duty to adequately supervise the children entrusted to its care, a plaintiff must establish that ... the facility 'had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated.'" <u>Liang v. Rosedale Group Home</u>, 799 N.Y.S.2d 69, 71 (App. Div. 2d Dep't 2005) (<u>quoting</u> <u>Mirand v. City of New York</u>, 637 N.E.2d

263, 266 (N.Y. 1994)); Merice v. County of Westchester, 757 N.Y.S.2d 903, 904 (App. Div. 2d Dep't 2003).  Thus, in Mirand, the New York Court of Appeals found sufficient evidence to establish a school's liability for negligent supervision, resulting in one student assaulting another, when prior violent acts by the first student had put the school on notice of an imminent foreseeable danger, and there was a complete absence of security or supervisory personnel.  See 637 N.E.2d at 267.

This doctrine does not mean, however, that the City needed prior notice that a particular child in the facility on the night in question had a violent history or had exhibited prior similar conduct.  Although New York courts have held that actual or constructive notice to the school of prior similar conduct is "generally" required, see Mirand, 637 N.E.2d at 266, in other circumstances the potential danger could be reasonably foreseen and prevented even absent such notice.  See Garcia v. City of New York, 646 N.Y.S.2d 508, 510-11 (App. Div. 1st Dep't 1996) (holding that a school could be liable for an assault by an older student on a five-year-old kindergarten student who was sent into a public bathroom unescorted, despite no notice of prior acts by the older student, because it was reasonably foreseeable that sending a five-year-old into a public bathroom unaccompanied could

-87-

create a risk of assault); see also Murray v. Research Found.,
707 N.Y.S.2d 816, 821 (Sup. Ct. Monroe County 2000) ("Where
the actions to be taken by the school are so obvious and could
easily have prevented the harm notice is not necessarily an
issue."). But see Liang, 799 N.Y.S.2d at 71 (holding that a
sexual assault of a fifteen-year-old in a children's group
home by another teenage resident was not reasonably
foreseeable to the City, ACS, and the group home, when there
were no prior assaults of that nature at the facility and the
resident who committed the assaults had no prior history of
violent or threatening behavior).

Here, there is a triable issue of fact as to whether the
City Defendants breached their duty to Antonia by
understaffing the ACS facility (and thus negligently
supervising her) and whether such breach proximately caused
her injuries.  Although there is no real dispute (other than
Plaintiffs' unsuccessful attempt to challenge the personal
knowledge of Maye, the affiant who described ACS's security
procedures) as to the existence of the security practices and
procedures of ACS -- which included metal detectors, guards
and sign-in procedures, monitored entrances, and employee
training to intervene if any unaccompanied children or
strangers were present in the facility -- there is, as set
forth above, a triable issue of fact as to whether the

facility was understaffed and whether such understaffing created a foreseeable risk of injury to Antonia.

Plaintiffs have argued that the presence of older children on the same floor, as well as children who may have been on or in need of psychotropic medication on that floor, made it reasonably foreseeable that an infant could be injured without the proper amount of staffing to provide oversight. Although Plaintiffs have not set forth any evidence that any children on or in need of psychotropic medication were present at the ACS facility during Antonia's stay, making these assertions almost entirely speculative, there is evidence that at least one sixteen-year-old was present on the same floor as Antonia. While the mere presence of an older child on the floor does not by itself mean that Antonia was injured by that child, a reasonable juror could conclude that enabling infants and teenagers to be on the same floor in a setting that may have been under-supervised or unattended created a foreseeable risk of injury to the infants. See Garcia, 646 N.Y.S.2d at 510-11. Moreover, the City Defendants have conceded for summary judgment purposes that Antonia was injured before leaving the ACS facility. Thus, the Court denies the City Defendants' summary judgment motion on this state law claim.

E.   CITY LIABILITY FOR FOSTER AGENCY DEFENDANTS' ACTIONS

Finally, the City contends that it is not liable if

-89-

Antonia was injured while at the foster home.  (A theory of negligent supervision in the foster home is asserted in Count Two.)  It cites to <u>Lara v. City of New York</u>, a State Supreme Court case which held that the City could not be vicariously liable for the acts of a child care agency that was an independent contractor rather than its agent.  726 N.Y.S.2d 217, 224 (Sup. Ct. N.Y. County 2001).  However, missing from the parties' submissions is any articulation of facts supporting the relation between the City and CHB.  The Court therefore declines to grant summary judgment for the City Defendants on this theory at this time.

### VI.    DISCUSSION OF CLAIMS ASSERTED AGAINST FOSTER AGENCY DEFENDANTS

The Foster Agency Defendants (CHB and its employee Seda) have separately moved for summary judgment.  The Foster Agency Defendants argue that they cannot be liable as a matter of law because their conduct did not rise to the level of deliberate indifference or even negligence.  In addition, the Foster Agency Defendants argue that their conduct was not the proximate cause of Plaintiffs' injuries.  Finally, CHB argues that it is immune from state law negligence claims by operation of § 419 of New York's Social Services Law.

As indicated earlier, Plaintiffs have abandoned the negligent placement theory asserted in Count Two, although they have not abandoned a theory of negligent supervision.

Specifically, Plaintiffs contend that the Foster Agency Defendants negligently supervised the foster parents when Seda failed to tell Cartagena to immediately take Antonia to the hospital.  Count Three's claim of substantive due process violations is asserted against the Foster Agency Defendants; as are Count Four's claims of unconstitutional and negligent hiring, training, and supervision.

A.  WHETHER PHILLIPS AND GREEN HAVE STANDING TO BRING INDIVIDUAL CLAIMS UNDER § 1983

Preliminarily, the Court disposes of the Foster Agency Defendants' argument that Phillips and Green do not have standing to sue under § 1983 for their own losses.  The Foster Agency Defendants correctly note that parents lack standing to bring individual claims under § 1983 based solely upon deprivation of a child's constitutional rights.  See Morgan v. City of New York, 166 F. Supp. 2d 817, 820 (S.D.N.Y. 2001) (dismissing mother's § 1983 claims because she "lacks standing to bring individual claims under § 1983 based upon a deprivation of her daughter's constitutional rights").  However, Phillips's and Green's individual § 1983 claims are not derivative of Antonia's own constitutional rights, but arise from their own loss of the parent-child relationship.

The right to care and custody of one's child has been recognized as a constitutional procedural and substantive due process right.  See Kia P. v. McIntyre, 235 F.3d 749, 758 (2d

-91-

Cir. 2000) ("We have described the interest of a parent in the custody of his or her children as a 'fundamental, constitutionally protected liberty interest.'") (quoting Gottlieb, 84 F.3d at 511); see Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (observing that a family has, "in general terms, a substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state'") (quoting Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977)); Wilkinson v. Russell, 182 F.3d 89, 103 (2d Cir. 1999) ("It has long been settled in this Circuit 'that a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection.'") (quoting Cecere v. City of New York, 967 F.2d 826, 829 (2d Cir.1992)) (alteration in original); Duchesne, 566 F.2d at 825 (describing right of family to remain together as "the most essential and basic aspect of family privacy" and that "[t]his right to the preservation of family integrity encompasses the reciprocal rights of both parent and children) (emphasis added). Indeed, the Supreme Court has observed that "[t]he liberty interest ... of parents in the care, custody, and control of their children - is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 27, 65 (2000).

-92-

Because freedom from government interference with the parent-child relationship is a constitutional right of the parents, Phillips and Green have standing to assert it.[34] Whether such right encompasses freedom from the allegedly unconstitutional actions of the Foster Agency Defendants in this case, however, is not as clear. The right to family integrity encompasses "the interest of the parent in the 'companionship, care, custody and management of his or her children,'" Duchesne, 566 F.2d at 825 (citations omitted). Yet this right has been articulated in cases involving removal of a child from custody. See, e.g., id.

Here, the Foster Agency Defendants were not involved in Antonia's removal from the custody of her parents. Instead, Plaintiffs' claims against these defendants stem from allegedly unconstitutional actions relating to Antonia's medical care: Plaintiffs contend that CHB's and Seda's conduct irreparably and permanently damaged the parent-child

---

[34] The parties have not addressed whether, given subsequent findings of the Family Court against Green and Phillips, these Plaintiffs still have standing either to assert their own claims or to bring claims on behalf of Antonia. If Plaintiffs meet the standing requirements at the time the Complaint was filed, standing exists. See Marisol A. v. Giuliani, No. 95 Civ. 10533, 1998 WL 274472, at *3 (S.D.N.Y. May 27, 1998). Whether a plaintiff with initial standing still has standing in later stages of the litigation implicates the related doctrine of mootness. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (quoting commentator's observation that mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."); Pederson v. Lousiana State Univ., 213 F.3d 858, 869-70 (5th Cir. 2000). At a later point in this proceeding the Court may ask the parties to address this issue.

-93-

relationship by causing Antonia's severe and permanent injuries. This is essentially an attempt to invest a loss of companionship claim with constitutional protection. "Whether a parent of a child harmed in foster care has a claim of his or her own is an unsettled question in this circuit, although the Third Circuit has recognized such a claim." Rivers v. McLeod, 252 F.3d 99, 102 (2d Cir. 2001) (citing Estate of Bailey v. County of York, 768 F.2d 503, 509 n.7 (3d Cir. 1985), abrogated on other grounds by Deshaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989)). Several of the cases cited by the Foster Agency Defendants, while finding no § 1983 claim for loss of companionship based on injuries to a child or parent, are not from this Circuit and note this disagreement. See Gravely v. Madden, 964 F. Supp. 260, 264 (S.D. Ohio 1995) ("Whether § 1983 can form the basis of a claim for the loss of the parent-child relationship is a subject of disagreement in the federal courts."); Broadnax v. Webb, 892 F. Supp. 188, 189 (E.D. Mich. 1995) ("Federal courts have expressed wide disagreement over whether section 1983 can support a claim for loss of companionship."). In Morgan, however, a court in this District concluded that a mother lacked standing where the only harm asserted by the mother was emotional distress stemming from the alleged unconstitutional deprivation of her daughter of a public high school education.

See 166 F. Supp. 2d at 820 ("There is no indication that [the mother] suffered any harm other than emotional distress due to the alleged discrimination against her daughter.  Because emotional distress does not constitute a violation of a federally protected constitutional right, [the mother's] claim under § 1983 is dismissed.").

The other case cited by the Foster Agency Defendants arose outside of this District, but held that parents lacked standing where they did not bring a claim for violation of their own constitutional rights but essentially only a derivative action for emotional distress.  See Burrow v. Postville Comty. Sch. Dist., 929 F. Supp. 1193 (N.D. Iowa 1996).  However, because the parents here have standing to assert a right at least as against the City Defendants for Antonia's allegedly unlawful removal, the Court tables consideration of this issue at this time.  Moreover, the point is ultimately moot, because in the analysis that follows the Court concludes that the Foster Agency Defendants did not act with the requisite deliberate indifference required to sustain a claim under § 1983.

B.   SECTION 1983 CLAIMS

A claim under § 1983 requires both "(1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such

conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the Untied States." Dwares v. City of New York, 985 F.2d 94, 96 (2d Cir. 1993).

    1.   Whether CHB and Seda Were Acting under Color of State Law

No party here has raised the issue of whether CHB, a private institution, and Seda, its employee, are state actors or have acted under color of state law; CHB certainly has not contested the appropriateness of § 1983 liability on this ground.  Yet § 1983 provides a cause of action only against those acting "under color of state law."  See 42 U.S.C. § 1983; Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006); Kia P., 235 F.3d at 755; Dwares, 985 F.2d at 98.

Section 1983's "under color of state law" provision has been treated as the equivalent of the Fourteenth Amendment's "state action" requirement, and thus conduct satisfying the state action prerequisite of the Fourteenth Amendment satisfies § 1983's corresponding "under color of state law" standard, although the reverse is not necessarily true.  See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2 (2001); Lugar v. Edmonson Oil Co., 451 U.S. 922, 935 & n.18 (1982).

State action exists "only if[] there is such a 'close nexus between the State and the challenged action' that

-96-

seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood Acad., 531 U.S. at 295 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)).  The criteria for determining state action "lack rigid simplicity," and "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient."  Id.  The Supreme Court has provided the following summary of situations where state action has been found:

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State or its agents."  We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," when it has been delegated a public function by the State, when it is "entwined with governmental policies," or when government is "entwined in [its] management or control."

Id. at 296 (internal citations omitted).  Thus, while "'no single test'" identifies state actions and state actors, "'a host of facts ... can bear on the fairness of ... an attribution' of a challenged action to the State." Horvath v. Westport Library Ass'n, 362 F.3d 147, 151 (2d Cir. 2004) (quoting Brentwood Acad., 531 U.S. at 924)).

In the case of private child care agencies, courts in this Circuit have consistently held that such institutions act under color of state law for § 1983 purposes if the

organizations are authorized by New York Social Services Law to care for neglected children, at least insofar as they perform actions relevant to those duties. See Duchesne, 566 F.2d at 822 n.4 (holding that two private child care agencies, the New York Foundling Hospital and St. Joseph's Home for Children, were acting under color of state law because they fell within the definition in N.Y. Social Services Law § 371(10) of "authorized agencies" empowered to care for and have custody of children from state and city officials); Perez v. Sugarman, 499 F.2d 761 (2d Cir. 1974) (same; noting that the statute evidenced that the agencies were performing a public function, in that the activities "would have to be performed by the Government but for the activities of the private parties"); Vega, 2006 WL 397941, at *4 ("It is now well established in this circuit that private child-care institutions authorized by New York's Social Services Law to care for neglected children are acting 'under color of state law' for purposes of section 1983."); Wilder v. Bernstein, 645 F. Supp. 1292, 1315 (S.D.N.Y. 1986); Brooks v. Richardson, 478 F. Supp. 793, 795 (S.D.N.Y.1979)).

Although not every action by a private child care agency is necessarily "state action" for purposes of § 1983 or the Fourteenth Amendment,

> Plainly, an agency's decisions relating to the acceptance and care of a child placed with the agency by [the City],

-98-

> where the State and City remain ultimately responsible
> for the child's welfare, see N.Y. Soc. Serv. Law § 395,[35]
> and where the agency's decisions are directly
> circumscribed by state and/or city regulations, contain a
> "sufficiently close nexus [with] the State ... so that
> the action of the [agency] may be fairly treated as that
> of the State itself."

Wilder, 645 F. Supp. at 1315 (quoting Jackson v. Metropolitan

Edison Co., 419 U.S. 345, 351 (1974)); see Perez, 499 F.2d at

766 ("[T]his case directly involves defendants' mode of

conducting the public function and does not involve a

collateral aspect of the business of operating an institution

which cares for children.  The existence of this nexus has

made the courts more receptive to a finding of 'state

action.'") (internal quotation omitted); see also Kia P., 235

F.3d at 756-57 (holding that a private hospital was not a

state actor simply by virtue of providing medical care to a

baby, but became a state actor when it refused to release the

child after it was medically cleared, as part of the state's

reporting and enforcement machinery for detecting and

preventing child abuse and neglect).

　　　From these principles, it is clear that in order to find

that CHB (and Seda) were acting under color of state law, thus

---

[35] Section 395 provides that "[a] public welfare district shall be
responsible for the welfare of children who are in need of public
assistance and care, support and protection, residing or found in its
territory," and that "[s]uch assistance and care shall be administered
either directly by the public welfare official charged therewith, or by
another public welfare official acting on his behalf by and pursuant to
the provisions of this chapter, or through an authorized agency as defined
by this chapter."  N.Y. Soc. Serv. Law § 395.

subjecting them to potential claims under § 1983, CHB would need to be authorized by statute to care for neglected children, and the actions at issue must relate to the acceptance or care of a child placed with the agency by the City.

As indicated, no party has briefed this issue. Plaintiffs simply assert in the Complaint that CHB is an "agent" of ACS and the City, and that Seda was a case worker employed by CHB. (See Compl. ¶¶ 18, 19.) CHB states simply that it "is the foster care agency that screened, trained and supervised the foster parents." (Foster Agency Br. at 2.) For the purposes of further addressing the instant motion, the Court assumes that CHB carries out these duties as an "authorized agency" under New York Social Services Law § 371(10), which defines such agencies as

> [a]ny agency, association, corporation, institution, society or other organization which is incorporated or organized under the laws of this state with corporate power or empowered by law to care for, to place out or to board out children, which actually has its place of business or plant in this state and which is approved, visited, inspected and supervised by the department or which shall submit and consent to the approval, visitation, inspection and supervision of the department as to any and all acts in relation to the welfare of children performed or to be performed under this title.

N.Y. Soc. Serv. Law § 371(10)(a).[36]  In addition, the actions

---

[36] The Court takes judicial notice of a publication available on ACS's website, entitled "Administration for Children's Services" and described as an introduction to ACS, which lists Catholic Home Bureau as one of the social service agencies that "contract[s] with ACS to provide preventive,

at issue, consisting of the policies and procedures by which CHB supervises foster parents, as well as its staff in handling the supervision of foster parents, relate to the handling of children placed with CHB by the City and are actions that would have been performed by the City had CHB not undertaken those actions.  Accordingly, this Court finds that the actions of the Foster Agency Defendants at issue here were taken under color of law and thus that Plaintiffs may bring § 1983 claims against these defendants.

      2.    <u>Whether CHB and Seda Had the Requisite Deliberate Indifference</u>

The Constitutional rights alleged to be violated here are (1) the parents' substantive due process right to be free from interference with the parent-child relationship (Count Three); (2) Antonia's substantive due process right to protection from harm, <u>see</u> <u>Tylena</u>, 390 F. Supp. 2d at 302 ("'[C]hildren in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm.'").  This latter constitutional claim can be found in Count Four, which asserts a claim under § 1983 against CHB for negligent hiring, monitoring, and retention of its employees amounting to deliberate indifference.

—————————————

foster care and adoption services to children and families."  ACS Office of Communications, <u>Administration for Children's Services</u> (Feb. 2006), at 22, available at http://www.nyc.gov/html/acs/html/about/about.shtml (last visited Aug. 30, 2006).

Plaintiffs argue that "the substance of the telephone conversation between defendants Cartagena and Seda on the morning of January 24, 2003, under the circumstances, amounted to the deliberate indifference to the infant's welfare on the part of Seda and CHB."   (Mem. of Law in Opp'n to Defs.' Catholic Home Bureau and Marina Seda's Mot. for Summ. J., dated Jan. 30, 2006 ("Pl. Opp'n"), at 10.)  Where an employee of the agency is also being sued in his or her individual capacity, that employee must also exhibit deliberate indifference for the employee to be liable.  See Hernandez, 341 F.3d at 144 ("Defendants were sued in their individual capacities; the liability of each therefore depends on a showing that he or she acted with deliberate indifference."); Doe, 649 F.2d at 145 ("Defendants may be held liable under § 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference ....").  Thus, the Court must assess whether both Seda and CHB had the requisite deliberate indifference.

The Court finds, based on the evidence on the record before the Court, that no rational jury could find that Seda acted with the requisite deliberate indifference necessary to support a § 1983 claim.  Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." Brown, 520 U.S. at 410. "[O]rdinary negligence by itself could not establish a cause of action under [Section] 1983," Doe, 649 F.2d at 143, but evidence of "gross negligent conduct creates a strong presumption of deliberate indifference." Id. at 143. The Second Circuit has "often equated gross negligence with recklessness, and [has] defined it as the 'kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" Poe v. Leonard, 282 F.3d 123, 140 n.14 (2d Cir. 2002) (quoting Bryant v. Maffucci, 923 F.2d 979, 985 (2d Cir. 1991)) (further citations omitted).

Here, there is no evidence from which a reasonable factfinder could conclude that Seda exhibited the extreme misconduct that constitutes deliberate indifference or even gross negligence, as Seda did not have reason to know of facts creating a high degree of risk of physical harm to Antonia and did not deliberately fail to act in conscious disregard of or indifference to that risk. The facts suggest that Cartagena told Seda during the telephone conversation that Antonia was fussy, moaning, groaning, had barely slept, had vomited, looked skinny and dirty, had arrived with soiled clothes, had red markings near her eyes, may have come with the wrong milk

-103-

or formula, and that something seemed wrong with her.  The evidence further suggests that in the face of this information, Seda felt that the child was sick but did not know what was wrong with her, and felt that a visit to the doctor within 48 hours would suffice.  Seda had no medical training and did not recognize that Antonia's symptoms may have warranted immediate medical care, although she indicated in deposition that she is aware that when a child does not take food and is vomiting, there is a danger of dehydration. Although a jury could rationally infer that Seda, based on the information given to her, may have been negligent in not referring Cartagena to a medical provider who could properly assess the severity of Antonia's symptoms, a reasonable jury could not rationally infer that Seda was aware of a high degree of risk of harm to Antonia and deliberately chose to ignore it.  Plaintiffs essentially concede that Seda fails to meet this standard when they argue that Seda had "no idea of the severity" of Antonia's symptoms (Pl. Opp'n at 8), and that "Seda's ignorance in that regard is due to her complete lack of medical sophistication and thus as a layperson, Seda would not and did not appreciate the significance of Antonia's symptoms."  (Id. at 15).  While Seda's conduct may have been negligent, "ordinary negligence by itself could not establish a cause of action under [Section] 1983," Doe, 649 F.2d at

-104-

143.[37]

Plaintiffs also argue that deliberate indifference on the part of both CHB and Seda can be inferred from the existence of certain language in the contract between CHB and the foster parents.[38]  That contract required the foster parents, in the case of illness or accident, to contact CHB's medical clinic during working hours or a panel physician or other physician on nights and weekends.   The contract refers to this requirement as a "special regulation."   (CHB Agreement, attached as Ex. G to First Vanderpuye Aff., at CHB0174.) Plaintiffs point to Doe, where the Second Circuit held that "[t]he more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring a deliberate indifference from a failure to act."  Doe, 649 F.2d at 146.

Regardless of whether Doe's reasoning can be extended to duties created by private contract rather than statute or government regulation, this contract, to the extent it imposes duties, prescribes duties for the foster parents, not for Seda

---

[37] The Court has examined and finds both peculiar and without merit Plaintiffs' argument that Seda's conduct amounted to an unindicted felony of practicing medicine without a license in violation New York State Education Law § 6512 and that deliberate indifference can therefore be inferred from her conduct.

[38] Plaintiffs primarily argue that this language evidences deliberate indifference on CHB's part, but the Court will aslo address its relevance to the claims asserted against Seda.

or CHB.  It did not mandate a specific course of conduct for Seda or CHB, from nonfeasance of which deliberate indifference could reasonably be inferred.  The Court declines to find that deliberate indifference on Seda and CHB's part could be inferred from a contract describing duties and responsibilities undertaken by the foster parents.

Plaintiffs' § 1983 claims against CHB rest entirely on Seda's single telephone conversation with Cartagena and the allegation that Seda's conduct during the conversation resulted from CHB's failure to train and supervise her.  See Pl. Br. at 10 ("[I]t is plaintiff's [sic] claim that the substance of the telephone conversation between defendants Cartagena and Seda on the morning of January 24, 2003, under the circumstances, amounted to the deliberate indifference to the infant's welfare on the part of Seda and CHB."); id. at 15 ("Catholic Home Bureau's complete failure to train its employees as well as its foster parents to refer all reports pertaining to the illness of a foster child to the Medical Clinic constitutes a deliberate indifference to the well being and rights of the foster children which it places.").[39]

---

[39] This last contention suggests that Plaintiffs also assert a theory of negligent training and supervision of the foster parents amounting to deliberate indifference to constitutional rights.  However, the record does not contain any evidence from which a reasonable factfinder could conclude that CHB failed to train the foster parents in a way that amounted to deliberate indifference to constitutional rights.  The only evidence in the record pertaining to the training of foster parents is the undisputed fact that Gonzalez and Cartagena completed the training required to become foster parents.

-106-

However, as determined above, Seda did not commit any constitutional violation, and Plaintiffs do not identify any other person under CHB's employ or control who committed any constitutional violation.   Therefore, Plaintiffs' § 1983 claims against CHB must be dismissed.   See Heller, 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); Amato v. City of Saratoga Springs, 170 F.3d 311, 320 (2d Cir. 1999) ("[I]f a plaintiff fails to show that a constitutional violation occurred in the suit against the individual official, the corresponding cause of action against the municipality will be mooted since a claim of negligent training is only actionable where some constitutional violation actually occurred."); Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 132 (2d Cir. 1997) ("[A] a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised....") (citation omitted).

C.   STATE LAW CLAIMS

Plaintiffs assert a claim in Count Two for negligent supervision in the foster home, and a claim in Count Four for

negligent hiring, training and supervision.  To prevail on a negligence claim under New York law, a plaintiff must establish three elements:  that the defendant: "(1) owed a duty of care; (2) breached that duty; and (3) that the breach was the proximate cause of the plaintiff's injuries." Vega, 2006 WL 397941, at *5; see Alfaro, 210 F.3d at 114; Tylena, 390 F. Supp. 2d at 317; La Fountain, 654 N.Y.S.2d at 870-71 (citing Akins, 424 N.E.2d 531).  The Foster Agency Defendants have moved for summary judgment on the grounds that Plaintiffs cannot prove either a negligent breach of duty or proximate cause.  The Court finds that genuine issues of material fact preclude summary judgment on these claims.

  1. <u>Whether CHB and Seda Acted Negligently</u>

  The Foster Agency Defendants, relying on the affidavit of Christian, their expert, argue that the symptoms Cartagena described to Seda during their phone conversation were nonspecific, common occurrences, most often associated with benign gastrointestinal problems, and that the standard of care does not require children with these symptoms to be seen in the emergency room.  Therefore, they contend that Seda was not negligent because the advice that she gave to Cartagena – to take Antonia to the doctor "as soon as possible" - was appropriate under those circumstances.

  First, the Foster Agency Defendants selectively quote the

record.  Although Seda told Cartagena to take Antonia to the
doctor "as soon as possible," this statement was made in the
context of their discussing what formula Cartagena should give
Antonia.  As set forth above, the record also suggests that
upon learning that Antonia had a doctor's visit scheduled the
following Monday, Seda felt that waiting 48 hours would
suffice and told Cartagena she could wait.  Second, Christian
did aver that sleeplessness, irritability, and vomiting are
non-specific symptoms most often associated with benign
gastrointestinal problems that do not require a visit to the
emergency room, Seda also testified that Cartagena told her
about the red marks around Antonia's eyes.  Moreover,
Christian also averred that sleeplessness, irritability,
vomiting, not feeding normally, and petechial bruises "are all
signs and symptoms of ... inflicted head trauma." (Christian
Dep. at 5(c).).  Third, while the Court finds that the
evidence falls far short of suggesting that Seda acted with
the deliberate indifference necessary to sustain a
constitutional violation, that Seda had no medical training
and understood that Antonia was sick, raises a genuine issue
of material fact as to whether Seda acted reasonably under the
circumstances in not suggesting that Cartagena contact a
medical provider for advice or not referring the call to CHB's
medical staff, but instead suggesting that the appointment

could wait 48 hours.

Similarly, there is evidence in the record from which a reasonable factfinder could conclude that CHB acted negligently in failing to train and supervise its employees. Seda testified that she had no medical background and received no special training on the job but was "basically self-taught." (Seda Dep. at 60.)  This creates a genuine issue of material fact as to whether CHB was negligent in not training those employees that it designated as the point of contact for foster parents to direct medical questions to medical staff trained to answer those questions.[40]

2.   Proximate Cause

Genuine issues of material fact also exist as to whether Seda's and CHB's actions proximately caused Antonia's injuries.  Proximate cause is "that 'which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred.'" Caraballo v. United States, 830 F.2d 19, 22 (2d Cir. 1987) (quoting Rider v. Syracuse Rapid Transit Ry. Co., 171 N.Y. 139, 147, 63 N.E. 836 (N.Y. 1902)).  Proximate cause exists where the

---

[40] The Court notes that additional deposition testimony in the record but not cited to by the parties suggests that Seda may have been trained to refer certain symptoms to medical staff.  (See Seda Dep. at 30-33 (discussing how certain medical symptoms such as fever are "flags" for which children are sent to the emergency room).  However, neither party has pointed to this testimony or suggested any inferences that should be derived from it.  In any event, that Seda testified that she received no training at all creates a genuine issue of material fact as to the reasonableness of CHB's actions.

alleged negligence is a "substantial factor" in or "substantial cause" of the injury. See Derdiarian v. Felix Contracting Corp., 414 N.E.2d 666, 670 (N.Y. 1980); Dunham v. Village of Canisteo, 104 N.E.2d 872, 877 (N.Y. 1952); Mortensen v. Mem'l Hosp., 483 N.Y.S.2d 264, 270 (App. Div. 1st Dep't 1984). When failure to train and supervise is a substantial factor in producing the injury, such failure may be considered a proximate cause of that injury. See Green v. City of New York, No. 01 Civ. 1996, 2004 WL 213009, at *3 (S.D.N.Y. Feb. 4, 2004) (citing Mortensen, 483 N.Y.S.2d at 270).

The Foster Agency Defendants argue that earlier medical intervention would not have altered or improved Antonia's outcome, and therefore Seda's failure to instruct Cartagena to take Antonia the hospital immediately was not a proximate cause of her injuries. Relying on both Christian's and Kugler's affidavits, they argue that the accepted medical treatment for inflicted head trauma to an infant is to monitor until the child becomes obtunded, and only then are medical treatments that Antonia received -- intubation, hyperventilation, and mannitol -- administered. According to the Foster Agency Defendants, since such treatments would not have been initiated until Antonia became obtunded, and Antonia did not become obtunded until a few minutes before she was

hospitalized on January 25, 2003, any earlier arrival at the hospital would have made no difference in the outcome.

It is true that Christian averred that because it is not possible to predict the course of an infant's condition following an inflicted head trauma, the treatment given in cases of suspected inflicted head trauma, prior to severe neurological deterioration, is to monitor the child's condition, and that intubation, hyperventilation, and mannitol are given only when an infant becomes obtunded. It is also true that Kugler agreed that such treatments are given only when an infant becomes obtunded. (See Kugler Dep. at 64-65.) However, a genuine issue of material fact exists as to how long after becoming obtunded Antonia received these treatments, and whether this potential delay may have altered the outcome.

Although the Foster Agency Defendants contend that it took only 10 minutes after Antonia became obtunded to transport her to the hospital, other evidence in the record suggests that it took longer. Cartagena testified that the infant was unresponsive around 1:25 p.m.; hospital records pinpoint the time at 1:30 p.m. Yet Cartagena also stated that she arrived at the hospital at around 2:00 p.m., suggesting at least a 30 minute delay.

Plaintiffs' expert, Kugler, has stated that earlier

hospital admission would have altered the outcome, and that but for the delay, Antonia would not have been left with her severe injuries.   Specifically, Kugler testified that Antonia's injuries caused generalized cerebral edema as of January 23, 2003, and that the cerebral edema and intracranial pressure increased over the next two to three days, ultimately causing brain herniation at 1:30 p.m. on January 25, 2003. Kugler testified that had Antonia been presented earlier, that herniation would not have occurred. (See Kugler Dep. at 46). According to Kugler, additional medical intervention would include admission for observation and a CT scan.  (See id. at 161-62.)   Had the CT scan shown the cerebral edema, Antonia would have been admitted to an ICU and kept under close surveillance; as her status started to decline, the medical staff could have intervened and the brain herniation may have been avoided.  (See id. at 46-47; see also id. at 150-51.) Plaintiffs also point out that Christian testified that diuretics are sometimes used to decrease cerebral edema. (See Christian Dep., at 54-55.)   Kugler  reiterated that had intervention occurred two to twenty-four hours prior to herniation, Antonia's outcome would have been significantly better to a reasonable degree of medical certainty. (Id. at 152-53).   Finally, Kugler testified that the time until Antonia received Mannitol would have been different if Antonia

-113-

had already been admitted to the hospital.  (<u>See</u> <u>id.</u> at 162-63.)  Viewing the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that the Foster Agency Defendants, by assuring Cartagena that a visit to the physician could wait, proximately caused a delay in treatment  resulting in the ultimate severity of Antonia's condition.

     3.  <u>Qualified Immunity under Social Services Law § 419</u>

     The Foster Agency Defendants argue that CHB is entitled to qualified immunity from Plaintiffs' negligent supervision claims by operation of New York Social Services Law § 419.  That statute provides immunity from civil or criminal liability for "[a]ny person, official, or institution participating in good faith in the providing of a service pursuant to section four hundred twenty-four of this title, the making of a report, ... [or] the removal or keeping of a child pursuant to this title."  N.Y. Soc. Serv. Law § 419.  Section 419 further provides that good faith is presumed for any person, official, or institution "required to report cases of child abuse or maltreatment or providing a service pursuant to section four hundred twenty-four."  <u>Id.</u>  However, "'[i]t is well settled that a claim of qualified immunity cannot be raised to bar inquiry into an agency's or county's alleged negligent supervision of children in foster care.'"  <u>Liang</u>,

-114-

799 N.Y.S.2d at 71 (<u>quoting</u> <u>Merice</u>, 757 N.Y.S.2d at 904). New York's appellate courts in the First and Second Departments have held that § 419 is not intended to apply to negligent placement and supervision claims, but instead applies solely to reports of child abuse. <u>See</u> <u>Sean M.</u>, 795 N.Y.S.2d at 548; <u>Merice</u>, 757 N.Y.S.2d at 904; <u>see also</u> <u>Shabazz v. Sheltering Arms Children's Servs.</u>, 753 N.Y.S.2d 65, 65 (App. Div. 1st Dep't 2003) ("[§ 419] is limited to persons and agencies participating in good faith in the investigation of child abuse allegations...."); <u>Barnes v. Nassau County</u>, 487 N.Y.S.2d 827, 831 (App. Div. 2d Dep't 1985) ("[A] claim of immunity cannot be raised to bar inquiry into a county's alleged negligent acts in the placement and supervision of a child in foster care....").

The Foster Agency Defendants urge this Court to follow the contrary lower court decision of <u>Lara v. City of New York</u>, which analyzed the statute's language and legislative history to conclude that § 419 did apply to negligent placement and sueprvision claims asserted against agencies that place children in foster homes. <u>See</u> 726 N.Y.S.2d 217. However, "[i]n the absence of a decision by the New York Court of Appeals, the rulings of New York's intermediate appellate courts are at least of persuasive authority, but those of a state trial court are usually not binding precedent upon

federal courts." <u>Aponte v. New York City Health & Hosps.</u> <u>Corp.</u>, No. 82 Civ. 3778, 1983 U.S. Dist. LEXIS 18340, at *9 (S.D.N.Y. Mar. 23, 1983). In such situations, authority from the state intermediate appellate court is binding if that authority represents even only a "'defensible' prediction of what the state's highest court would say on the issue." <u>Lund</u> <u>v. Chem. Bank</u>, No. 84 Civ. 1621, 1990 WL 17711, at *2 (S.D.N.Y. Feb. 20, 1990). This Court therefore follows the reasoning of New York's intermediate appellate courts in <u>Sean</u> <u>M.</u> and <u>Merice</u> in concluding that § 419 does not provide qualified immunity for the Foster Agency Defendants here.

## VII.  <u>ORDER</u>

_____For the reasons set forth above, it is hereby

**ORDERED** that the motion (Docket No. 81) of defendants the City of New York, Kakilia Kinsey, Jesus Rivera, Shemain Webb-Alexander, and Kim Vorhees (collectively, the "City Defendants") for summary judgment dismissing the claims of plaintiffs Antonia Phillips by her parents Gertral Green ("Green") and Antonio Phillips ("Phillips") and Green and Phillips individually (collectively, "Plaintiffs"), is GRANTED with respect to Count One in that Count One is dismissed in its entirety; and it is further

**ORDERED** that the City Defendants' motion for summary judgment is GRANTED with respect to Count Two in that Count

-116-

Two is dismissed insofar as it relates to alleged constitutional violations by the City Defendants; and it is further

**ORDERED** that the City Defendants' motion for summary judgment is DENIED with respect to Count Two to the extent that Count Two asserts liability by the City Defendants for alleged negligent supervision in the foster home; and it is further

**ORDERED** that the City Defendants' motion for summary judgment is GRANTED with respect to Count Three in that Count Three is dismissed insofar as it relates to the City Defendants; and it is further

**ORDERED** that the City Defendants' motion for summary judgment is DENIED with respect to Count Four insofar as it relates to the City Defendants; and it is further

**ORDERED** that the motion (Docket No. 75) of Catholic Home Bureau and Maria Seda (collectively, the "Foster Agency Defendants") for summary judgment dismissing Plaintiffs' claims is GRANTED IN PART AND DENIED IN PART in that all counts against the Foster Agency Defendants are dismissed except Count Two insofar as it asserts a state law negligent supervision claim against the Foster Agency Defendants and Count Four insofar as it asserts state law negligence claims against the Foster Agency Defendants; and it is finally

-117-

**ORDERED** that a conference is set for Friday October 13, 2006 at 11:00 a.m., to discuss the status of this action in the light of the rulings set forth above and preparations for trial of remaining issues.

**SO ORDERED.**

Dated: New York, New York
       September 25, 2006

_____
                    Victor Marrero
                    U.S.D.J.